## FEDERAL TRADE COMMISSION v. A. E. STALEY MANUFACTURING CO. ET AL.

No. 559.  Argued February 28, 1945.—Decided April 23, 1945.

*Mr. Walter B. Wooden,* with whom *Solicitor General Fahy, Assistant Attorney General Berge, Messrs. Paul A. Freund, Matthias N. Orfield* and *W. T. Kelley* were on the brief, for petitioner.

*Mr. Carl R. Miller,* with whom *Messrs. Charles C. Le-Forgee* and *Paul D. Doolen* were on the brief, and *Mr. William D. Whitney* for respondents.

MR. CHIEF JUSTICE STONE delivered the opinion of the Court.

Respondents, a parent company and its sales subsidiary, are engaged in the manufacture and sale of glucose or corn syrup in competition with others, including the Corn Products Refining Company, whose methods of marketing and pricing its products are described in our opinion in *Corn Products Refining Co.* v. *Federal Trade Commission, ante,* p. 726. Respondents, in selling their glucose, have adopted a basing point delivered price system comparable to that of the Corn Products Refining Company. Respondents sell their product, manufactured at Decatur, Illinois, at delivered prices based on Chicago, Illinois, the price in each case being the Chicago price plus freight from Chicago to point of delivery.

In this proceeding, brought under § 11 of the Clayton Act, c. 323, 38 Stat. 730, 15 U. S. C. § 21, the Federal Trade Commission charged that respondents' pricing system resulted in price discriminations between different purchasers of glucose in violation of § 2 (a) of the Clayton Act, as amended by the Robinson-Patman Act, c. 592, 49 Stat. 1526, 15 U. S. C. § 13. The case was heard by the

Commission on stipulations of facts and exhibits, upon the basis of which the Commission ultimately made its findings. Applying the same principles as in the *Corn Products Refining Company* case, it concluded that respondents had made discriminations between different purchasers in the price of their product; and that respondents were unable to justify the discriminations, as permitted by § 2 (b) of the Clayton Act, by showing that they were made "in good faith" to meet a competitor's equally low price. The Commission accordingly made its order directing respondents to cease and desist from the price discriminations.

On review of the Commission's order, the Court of Appeals for the Seventh Circuit set the Commission's order aside, one judge dissenting. 144 F. 2d 221. One of the majority judges did not consider whether the price discriminations violated § 2 (a), but held that in any event they were made in good faith to meet their competitors' price within the meaning of § 2 (b). Another concurred in the result on the ground that the Commission had failed to make out a case of unlawful price discrimination, and for that reason he found no occasion to pass upon the merits of respondents' defense. The third judge dissented on the ground that respondents' discriminations were unlawful and not justified by competition. We granted certiorari. 323 U. S. 702.

The principal question for decision is whether respondents, who adopted the discriminatory price system of their competitors, including the Corn Products Refining Company, have sustained the burden of justifying their price system under § 2 (b) of the Clayton Act, as amended, by showing that their prices were made "in good faith" to meet the equally low prices of competitors. A further question is whether there was evidence to support the Federal Trade Commission's findings that respondents, in granting to certain favored buyers discriminatory prices

for their product, did not act "in good faith" to meet a competitor's equally low price within the meaning of § 2 (b) of the Clayton Act.

The Commission found that at all relevant times respondents have sold glucose, shipped to purchasers from their plant at Decatur, Illinois, on a delivered price basis, the lowest price quoted being for delivery to Chicago purchasers. Respondents' Chicago price is not only a delivered price at that place. It is also a basing point price upon which all other delivered prices, including the price at Decatur, are computed by adding to the base price, freight from Chicago to the point of delivery. The Decatur price, as well as the delivered price at all points at which the freight from Decatur is less than the freight from Chicago, includes an item of unearned or "phantom" freight, ranging in amount, in instances mentioned by the Commission, from 1 cent per hundred pounds at St. Joseph, Missouri, to 18 cents at Decatur. The Chicago price, as well as that at points at which the freight from Decatur exceeds freight from Chicago, required respondents to "absorb" freight, varying in instances cited by the Commission from 4 cents per one hundred pounds at St. Louis, Missouri, to 15½ cents per hundred pounds at Chicago.

The Commission found that this inclusion of unearned freight or absorption of freight in calculating the delivered prices operated to discriminate against purchasers at all points where the freight rate from Decatur was less than that from Chicago and in favor of purchasers at points where the freight rate from Decatur was greater than that from Chicago. It also made findings comparable to those made in the *Corn Products Refining Company* case that the effect of these discriminations between purchasers, who are candy and syrup manufacturers competing with each other, was to diminish competition between them.

The Commission also found that respondents, during a period of from five to ten days after they advance the prices of their product, customarily permit purchasers generally to "book" orders or secure options to purchase glucose at the old price, for delivery within thirty days, but that they also have permitted certain favored purchasers to secure additional extensions of time for delivery upon such options. In consequence of these time extensions, the favored buyers were enabled to secure glucose at a lower price than that concurrently being charged to other buyers. In some instances, after a price advance, respondents also made fictitious bookings on which deliveries were later made, at the option of the favored buyers; and in still other cases sales were made to favored purchasers long after the expiration of the booking period. Respondents also book glucose in tank car lots to certain purchasers who lack storage facilities for such quantities; respondents then actually make deliveries in tank wagon lots over a period of many months, during which they are selling to others upon like deliveries at higher prices.

These findings, and the conclusion of the Commission that the price discriminations involved are prohibited by § 2 (a), are challenged here. But, for the reasons we have given in our opinion in the *Corn Products Refining Company* case, the challenge must fail. The sole question we find it necessary to discuss here is whether respondents have succeeded in justifying the discriminations by an adequate showing that the discriminations were made "in good faith" to meet equally low prices of competitors.

## I

We consider first, respondents' asserted justification of the discriminations involved in its basing point pricing system. As we hold in the *Corn Products Refining Company* case with respect to a like system, price discriminations are necessarily involved where the price basing point

is distant from the point of production. This is because, as in respondents' case, the delivered prices upon shipments from Decatur usually include an item of unearned or phantom freight or require the absorption of freight with the consequent variations in the seller's net factory prices. Since such freight differentials bear no relation to the actual cost of delivery, they are systematic discriminations prohibited by § 2 (a), whenever they have the defined effect upon competition.

Respondents sought to justify these discriminations before the Commission, by a stipulation detailing the history and use of their present pricing system. From this it appears that in 1920, when respondents began the manufacture of glucose or corn syrup, they found that syrup manufactured by their competitors "was being sold at delivered prices in the various markets of the United States"; that in Chicago two large factories were manufacturing syrup and delivering it in Chicago at prices lower than prices then prevailing in any other market; and that the delivered price in such other markets was generally equal to the Chicago price plus the published freight rate from Chicago to the point of delivery. Respondents thus found in operation a pricing system which, if followed, would produce exact identity in prices of glucose of the several producers when sold in any city of the United States. Respondents, to gain access to the markets thus established, made their sales "by first quoting the same prices as were quoted by competitors and then making whatever reduction in price . . . was necessary to obtain business." When respondents soon found that their product would command the same market price as that of their competitors, they "adopted the practice of selling at the same delivered prices as [their] competitors, whatever they might be." Respondents have followed the same practice since June 19, 1936, the date of enactment of the Robinson-Patman Act.

Section 2 (b) of the Clayton Act provides:

"Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price . . . , the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: *Provided, however,* That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price . . . was made in good faith to meet an equally low price of a competitor . . ."

It will be noted that the defense that the price discriminations were made in order to meet competition, is under the statute a matter of "rebutting" the Commission's "prima-facie case." Prior to the Robinson-Patman amendments, § 2 of the Clayton Act provided that nothing contained in it "shall prevent" discriminations in price "made in good faith to meet competition." The change in language of this exception [1] was for the purpose of mak-

---

[1] As originally introduced, the Robinson-Patman amendment contained no provision similar to that in § 2 of the Clayton Act as originally enacted, which provided "That nothing herein contained shall prevent . . . discrimination in price in the same or different communities made in good faith to meet competition." In the Senate this existing provision was added by amendment to the Robinson-Patman bill. 80 Cong. Rec. 6426, 6435. In the House, the Judiciary Committee reported the bill with the proviso, substantially as enacted in § 2 (b). 80 Cong. Rec. 8139. The Conference Committee rejected the Senate version and approved the House amendment. The Report of the Conference Committee, speaking of the Senate proviso, said: "This language is found in existing law, and in the opinion of the conferees is one of the obstacles to enforcement of the present Clayton Act. . . . A provision relating to the question of meeting competition, intended to operate only as a rule of evidence in a proceeding before the Federal Trade Commission, is included in subsection (b) . . ." H. Rep. No. 2951, 74th Cong., 2d Sess., pp. 6–7.

ing the defense a matter of evidence in each case, raising a question of fact as to whether the competition justified the discrimination. See the Conference Report, H. Rep. No. 2951, 74th Cong., 2d Sess., pp. 6–7; see also the statement of Representative Utterbach, the Chairman of the House Conference Committee, 80 Cong. Rec. 9418.

But respondents argue that they have sustained their burden of proof, as prescribed by § 2 (b), by showing that they have adopted and followed the basing point system of their competitors. In the *Corn Products Refining Company* case we hold that this price system of respondents' competitor in part involves unlawful price discriminations, to the extent that freight differentials enter into the computation of price, as a result of the selection as a basing point of a place distant from the point of production and shipment. Thus it is the contention that a seller may justify a basing point delivered price system, which is otherwise outlawed by § 2, because other competitors are in part violating the law by maintaining a like system. If respondents' argument is sound, it would seem to follow that even if the competitor's pricing system were wholly in violation of § 2 of the Clayton Act, respondents could adopt and follow it with impunity.

This startling conclusion is admissible only upon the assumption that the statute permits a seller to maintain an otherwise unlawful system of discriminatory prices, merely because he had adopted it in its entirety, as a means of securing the benefits of a like unlawful system maintained by his competitors. But § 2 (b) does not concern itself with pricing systems or even with all the seller's discriminatory prices to buyers. It speaks only of the seller's "lower" price and of that only to the extent that it is made "in good faith to meet an equally low price of a competitor." The Act thus places emphasis on individual competitive situations, rather than upon a general system of competition. Respondents are here seeking to

justify delivered prices which discriminate in favor of buyers in Chicago and at points nearer, freightwise, to Chicago than to Decatur, by a pricing system involving phantom freight and freight absorption. We think the conclusion is inadmissible, in view of the clear Congressional purpose not to sanction by § 2 (b) the excuse that the person charged with a violation of the law was merely adopting a similarly unlawful practice of another.[2]

The statutory test is whether respondents, by their basing point system, adopted a "lower price . . . in good faith to meet an equally low price of a competitor." This test presupposes that the person charged with violating the Act would, by his normal, non-discriminatory pricing methods, have reached a price so high that he could reduce it in order to meet the competitor's equally low price. On the contrary, respondents have used their pricing system to adopt the delivery prices of their Chicago competitors, by charging their own customers upon shipments from Decatur the Chicago base price plus their competitors' costs of delivery from Chicago. Even though respondents, at many delivery points, enjoyed freight advantages over their competitors, they did not avail of the opportunity to charge lower delivered prices. Instead they maintained their own prices at the level of their competitors' high prices, based upon the competitors' higher costs of delivery, by including phantom freight in their own delivered prices.

Respondents have never attempted to establish their own non-discriminatory price system, and then reduced

---

[2] The Chairman of the House Conferees, in presenting the Conference Report, emphasized with illustrations that "this procedural provision cannot be construed as a carte blanche exemption to violate the bill so long as a competitor can be shown to have violated it first, nor so long as that competition cannot be met without the use of oppressive discriminations in violation of the obvious intent of the bill." See 80 Cong. Rec. 9418.

their price when necessary to meet competition. Instead they have slavishly followed in the first instance a pricing policy which, in their case, resulted in systematic discriminations, by charging their customers upon shipments from Decatur, the Chicago base price plus their competitors' actual costs of delivery from Chicago. Moreover, there is no showing that if respondents had charged nondiscriminatory prices, they would be higher in all cases than those now prevailing under their basing point system. Hence it cannot be said that respondents' price discriminations have resulted in "lower" prices to meet equally low prices of a competitor.

Respondents make an ingenious argument that they could have used their present price for deliveries at Decatur (which is the Chicago base price plus freight from Chicago to Decatur) as their base price; and that with the addition of freight from Decatur to the points of delivery, the delivered prices would in all cases then be higher than the present prices, so that reduction to meet the lower prices of their competitors would be permissible under § 2 (b). But this is no answer to the ruling of the Commission that the competitive situation did not justify respondents' pricing system, since respondents' argument is based upon a hypothesis, which never in fact existed. The fact that respondents' prices are lower than those they might have charged, but never did charge, does not tend to show the establishment of a lower price to meet an equally low price of a competitor.

Further, we cannot say that respondents' discriminations in price were shown to have been made in a "good faith" effort to meet competition, as § 2 (b) requires. As we have pointed out here and in our opinion in the companion case, *Corn Products Refining Co.* v. *Federal Trade Commission, supra,* the basing point system used by respondents discriminates systematically in favor of buyers in Chicago and at points nearer, freightwise, to Chicago

than to Decatur, and against purchasers at Decatur and points nearer to it, by reason of respondents' absorption of freight and collection of phantom freight.

This is illustrated most graphically by respondents' delivered prices at Decatur and Chicago. On August 1, 1939, these were $2.09 at Chicago, and $2.27 at Decatur. Since respondents incurred 18 cents freight in shipping to Chicago, their net price at the Decatur factory on shipments to Chicago was $1.91. The discrimination in favor of Chicago and against Decatur was thus 36 cents, or 17 per cent of the Chicago price, in a field where a difference of a fraction of a cent in the sales price of the candy processed from the glucose could divert buyers from one candy manufacturer to another. Only to a lesser degree are there like discriminations when other points of delivery are compared.

The Commission's conclusion seems inescapable that respondents' discriminations, such as those between purchasers in Chicago and Decatur, were established not to meet equally low Chicago prices of competitors there, but in order to establish elsewhere the artificially high prices whose discriminatory effect permeates respondents' entire pricing system. The systematic adoption of a competitor's prices by including unearned freight in respondents' delivery price or, what amounts to the same thing, the maintenance of a discriminatory and artificially high f. o. b. factory price in order to take advantage of the correspondingly high prices of a competitor, based on its higher costs of delivery, is not sufficient to justify the discrimination, for respondent fails to show, as the statute requires, the establishment of a "lower price" made in good faith to meet the equally low price of a competitor. By adopting the price system of their competitors, respondents have succeeded in many instances in establishing an artificially high price and have thus secured the benefit of the high

price levels of a competitor whose costs of delivery are greater.

A price discrimination is measured by the difference between the high price to one purchaser and the lower price to another. Respondents' price discriminations were not dictated by the lower delivery costs or lower delivery prices of their competitors. In none of the markets in which respondents had a freight advantage over their Chicago competitors did respondents reduce their prices below those of their competitors. Instead they met and followed their competitors' prices by prices rendered artificially high, by the inclusion of unearned freight proportioned to the amount by which their competitors' delivered costs exceeded their own.

We cannot say that a seller acts in good faith when it chooses to adopt such a clearly discriminatory pricing system, at least where it has never attempted to set up a non-discriminatory system, giving to purchasers, who have the natural advantage of proximity to its plant, the price advantages which they are entitled to expect over purchasers at a distance. And for like reasons, we must reject respondents' argument that the Commission's order could be rendered nugatory, by respondents' establishing such a high factory price as always to admit of reductions in order to meet the prices of competitors who are using a Chicago basing point system. For we think it could not be said that this practical continuation of the present discriminatory basing point system would be in good faith. But it does not follow that respondents may never absorb freight when their factory price plus actual freight is higher than their competitors' price, or that sellers, by so doing, may not maintain a uniform delivered price at all points of delivery, for in that event there is no discrimination in price.

Congress has left to the Commission the determination of fact in each case whether the person, charged with making discriminatory prices, acted in good faith to meet a competitor's equally low prices. The determination of this fact from the evidence is for the Commission. See *Federal Trade Commission* v. *Pacific States Paper Trade Assn.*, 273 U. S. 52, 63; *Federal Trade Commission* v. *Algoma Lumber Co.*, 291 U. S. 67, 73. In the present case, the Commission's finding that respondents' price discriminations were not made to meet a "lower" price and consequently were not in good faith, is amply supported by the record, and we think the Court of Appeals erred in setting aside this portion of the Commission's order to cease and desist.

## II

The Commission found that respondents had not sustained the burden of rebutting the prima facie case of price discriminations involved in their booking practices, since they had failed to show that their lower prices were "made in good faith to meet an equally low price of a competitor." The facts as stipulated were only that the discriminations were made in response to verbal information received from salesmen, brokers or intending purchasers, without supporting evidence, to the effect that in each case one or more competitors had granted or offered to grant like discriminations. It is stipulated that respondents, "believing such report to be true, has then granted similar" price discriminations. The record contains no statements by the persons making these reports and discloses no efforts by respondents to investigate or verify them, and no evidence of respondents' knowledge of their informants' character and reliability. It is admitted that in some instances respondents made sales upon bookings which they suspected had been made without knowledge of the buyers.

In appraising the evidence, the Commission recognized that the statute does not place an impossible burden upon sellers, but it emphasized the good faith requirement of the statute, which places the burden of proving good faith on the seller, who has made the discriminatory prices. The Commission commented on the tendency of buyers to seek to secure the most advantageous terms of sales possible, and upon the entire lack of a showing of diligence on the part of respondents to verify the reports which they received, or to learn of the existence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact be meeting the equally low price of a competitor. The Commission thought that respondents' allowance of discretionary prices, in circumstances which strongly suggested that the buyers' claims were without merit, as well as respondents' readiness to grant discriminatory prices without taking any steps to verify the existence of a lower price of competitors, and the entire absence of any showing that respondents had taken any precaution to conduct their business in such manner as to prevent unwarranted discriminations in price, all taken together, required the conclusion that respondents had not sustained the burden of showing that their price discriminations were made in good faith to meet the lower prices of competitors.

Section 2 (b) does not require the seller to justify price discriminations by showing that in fact they met a competitive price. But it does place on the seller the burden of showing that the price was made in good faith to meet a competitor's. The good faith of the discrimination must be shown in the face of the fact that the seller is aware that his discrimination is unlawful, unless good faith is shown, and in circumstances which are peculiarly favorable to price discrimination abuses. We agree with the Commission that the statute at least requires the seller, who has knowingly discriminated in price, to show the ex-

istence of facts which would lead a reasonable and prudent person to believe that the granting of a lower price would in fact meet the equally low price of a competitor. Nor was the Commission wrong in holding that respondents failed to meet this burden.

The appraisal of the evidence and the inferences to be drawn from it are for the Commission, not the courts. See *Federal Trade Commission* v. *Pacific States Paper Trade Assn., supra,* 63; *Federal Trade Commission* v. *Algoma Lumber Co., supra,* 73. We cannot say that the Commission's inference is not supported by the stipulated facts or that its inference does not support its order.

The Commission's order will be sustained. The judgment below will be reversed, and the cause remanded with instructions to enforce the Commission's order.

*So ordered.*

MR. JUSTICE ROBERTS took no part in the consideration or decision of this case.

MR. JUSTICE JACKSON concurs in the result.