499 F.2d 395
 1974-2 Trade Cases 75,216
 HARBOR BANANA DISTRIBUTORS, INC., Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
UNITED BRANDS COMPANY and Chiquita Brands, Inc., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
HARBOR BANANA DISTRIBUTORS, INC., Petitioner,
v.
FEDERAL TRADE COMMISSION, Respondent.
UNITED BRANDS COMPANY and Chiquita Brands, Inc., Petitioners,
v.
FEDERAL TRADE COMMISSION, Respondent.
 Nos. 73-1640, 73-1657, 73-2079 and 73-2080.
 United States Court of Appeals, Fifth Circuit.
 Aug. 22, 1974.
 
 Ederhard P. Deutsch, Bernard Marcus, Charles K. Reasonover, New Orleans, La., for Harbor Banana Distributors, Inc.
 Harry L. Shniderman, Michael J. Henke, Washington, D. C., Henry C. Thumann, Los Angeles, Cal., for United Brands Co. and Chiquita Brands, Inc.
 Charles Tobin, Secretary, Gerald Harwood, Asst. Gen. Counsel, Karl H. Buschmann, Atty., F.T.C., Washington, D.C., for the Federal Trade Com'n.
 Before BELL, SIMPSON and INGRAHAM, Circuit Judges.
 BELL, Circuit Judge:
 
 
 1
 These appeals, consolidated for decision, involve a Federal Trade Commission complaint charging United[1] in one count with price discrimination in violation of 2(a)[2] of the Robinson-Patman Act, 15 U.S.C.A. 13(a), in favor of Harbor; charging Harbor in another count with violating 2(f)[3] of the Act, 15 U.S.C.A. 13(f), by inducing the discrimination. In an additional count Harbor was charged with violating 7[4] of the Clayton Act, 15 U.S.C.A., 18, by purchasing the assets of a competitor.
 
 
 2
 The administrative law judge ruled against the Commission on the Robinson-Patman Act contentions and in favor of the Commission on the 7 violation. On appeal by all parties, the Commission, with one member dissenting, affirmed the 7 holding but disagreed with the initial decision as to the Robinson-Patman Act charges. Specifically, for the purposes of these appeals, the finding that United acted to meet competition under 2(b)[5] of the Act, 15 U.S.C.A. 13(b), was rejected. Having rejected this defense, the administrative law judge was then found to have been in error in dismissing the 2(f) charge against Harbor as well as the 2(a) charge against United.
 
 
 3
 We disagree with the Commission as to the Robinson-Patman charges, being of the view that United was well within the 2(b) defense in its questioned conduct. It follows from this and from the fact that there was no charge or proof that the cooperation of Standard at Long Beach with Harbor was discriminatory, that there could be no violation of 2(f) by Harbor. As will be seen, the 7 violation through the acquisition of a competitor is supported and there is no merit in the petition for review as to the order in that respect.
 
 
 4
 The alleged Robinson-Patman violation involves secondary lines of commerce, i.e., banana jobbers in the Los Angeles area consisting of Harbor and its competitors. There is no primary line question in issue except by way of background in that the alleged discrimination arose out of competition between United and its major competitor, Standard.
 
 
 5
 Beginning in 1960, Standard Fruit and Steamship Company, the major competitor of United in producing and importing bananas, entered the Los Angeles market. Up until 1964, United had enjoyed one hundred per cent of Harbor's business. Indeed, Harbor was United's second largest customer in the United States.
 
 
 6
 Harbor and its competing jobbers[6] received delivery of bananas from United at United's Wilmington, California terminal located about thirty miles south of downtown Los Angeles. Harbor had its processing plant at Long Beach about nine miles north of Wilmington, while its competitors had their processing plants in downtown Los Angeles.
 
 
 7
 Harbor had conceived the idea of having bananas unloaded at Long Beach direct from United's ships to save the cost of transportation between Wilmington and Long Beach, Harbor's processing plant being at Long Beach. The idea was for Harbor to build a facility adjacent to the docks to permit direct delivery from the ships into Harbor's processing plant. United refused to provide this service over a period of two to three years but in 1963, Standard decided to build a new terminal at Long Beach and to relocate there from its previous location at Wilmington.
 
 
 8
 Then in early 1964, pursuant to negotiations, Harbor and Standard reached an agreement whereby Harbor arranged to construct a processing plant adjacent to Standard's proposed new terminal at Long Beach, and Standard provided a conveyor belt between the two facilities to permit the ready transfer of bananas from Standard to Harbor. Construction of the facilities began in 1964 and was completed in 1965. Even before completion, Harbor filled approximately 15 per cent of its total banana purchases in 1964 from Standard.[7] This was the first loss of Harbor's business by United.
 
 
 9
 United was quick to take notice of Standard's inroad with respect to its prime customer and then agreed to provide a partial service to Harbor at Long Beach. It is this service which is claimed as being discriminatory by the Commission. The service was continued for a period of some five years but was ultimately discontinued by United inter alia on account of complaints being received from its other customers.
 
 
 10
 It is undisputed that the service provided was in an effort to meet that provided by Standard to Harbor. It is also undisputed that the service provided by United did not evceed the Standard service. In fact, it fell short of that service. Standard provided a conveyor belt from its dock directly into Harbor's plant. United continued its operation at Wilmington but simply agreed to stop one ship each week at Long Beach to unload advance or pre-ordered bananas. See fn. (6), supra. Harbor continued to purchase seaboard and roller priced bananas from United at Wilmington as well as some advance ordered bananas.
 
 
 11
 We assume arguendo that there was proscribed discrimination in fact from the service to Harbor at Long Beach by United. This enables us to center on the 2(b) defense of the good faith meeting of competition.
 
 
 12
 The 2(b) defense is absolute if made out. The burden is on the discriminator to show that he acted in a good faith belief to meet the price or service, as the case may be, of a competitor. The test in making this determination is that the discriminator must show the existence of facts which would lead a reasonable and prudent person to believe that the granting of the lower price or service would in fact meet the equally low price or service of a competitor. Federal Trade Commission v. A. E. Staley Manufacturing Company, 1945, 324 U.S. 746, 759-760, 65 S.Ct. 971, 977, 89 L.Ed. 1338; Hanson v. Pittsburgh Plate Glass Industries, Inc., 5 Cir., 1973, 482 F.2d 220, 226, cert. denied, 414 U.S. 1136, 94 S.Ct. 880, 38 L.Ed.2d 761; Hampton v. Graff Vending Company, 5 Cir., 1973, 478 F.2d 527, 534, cert. denied, 414 U.S. 859, 94 S.Ct. 69, 38 L.Ed.2d 109; see Callaway Mills Company v. Federal Trade Commission, 5 Cir., 1966, 362 F.2d 435.
 
 
 13
 The standard we use in reviewing the order of the Commission as it relates to the 2(b) defense is to determine whether the Commission's findings are supported by substantial evidence, Colonial Stores, Incorporated v. Federal Trade Commission, 5 Cir., 1971, 450 F.2d 733, 739-740. Evidence is substantial if it would '. . . justify, if the trial were to a jury, a refusal to direct a verdict when the conclusion sought to be drawn from it is one of fact for the jury'. National Labor Relations Board v. Columbian Enameling & Stamping Company, 1939, 306 U.S. 292, 300, 59 S.Ct. 501, 505, 83 L.Ed. 660; Universal Camera Corp. v. National Labor Relations Board, 1951, 340 U.S. 474, 477, 71 S.Ct. 456, 95 L.Ed. 456.
 
 
 14
 Applying this standard of review to the record before us, we have no difficulty in concluding that the Commission's order as to the 2(b) defense is without substantial evidence to support it. The evidence consists of facts which would lead a reasonable and prudent person to believe that the granting of the service in question by United to Harbor was to meet the competition of Standard. We are unable to find any evidence to the contrary and thus United has sustained its burden. The posture of the evidence is well within the directed jury verdict in a jury trial standard, supra. See Boeing Company v. Shipman, 5 Cir., (en banc), 1969, 411 F.2d 365, 370. The petition to review and set aside the cease and desist order finding a violation of 2(a) must be granted on the basis that the 2(b) defense was establised.
 
 
 15
 It follows that the 2(f) charge against Harbor must also be set aside. Harbor was not charged with having induced a discriminatory service from Standard, only the discrimination from United. We have held that the discrimination by United was not prohibited because of the 2(b) defense. A prohibited discrimination is a condition precedent to a finding of unlawful conduct under 2(f). Cf. Automatic Canteen Co. v. Federal Trade Commission, 1953, 346 U.S. 61, 73 S.Ct. 1017, 97 L.Ed. 1454.
 
 
 16
 This leaves for decision the order against Harbor based on 7 of the Clayton Act. This order finds a violation of 7 by Harbor in purchasing a competitor. The competitor consisted of two corporations in each of which Charles C. McCann was sole stockholder.
 
 
 17
 McCann wished to go out of the banana business although its business was second only to that of Harbor in the Los Angeles market. Harbor purchased from McCann its trucks and its leases of six market stalls and a warehouse located in the downtown produce market as well as the personal property located in the leasehold properties. A total of $150,000 was paid to McCann for these properties with McCann reserving trade names, good will and accounts receivable.
 
 
 18
 At the time of the acquisition, Harbor had 40 per cent of the Los Angeles banana wholesale market and McCann had about 24 per cent of the same market. These shares of the market seem quite large in the face of the miniscule sum involved in the acquisition. Nevertheless, it is for the Commission and not this court to determine which acquisitions will be proscribed under 7. Our role is to review the case as presented and we find that the order of the Commission finding the acquisition unlawful under 7 is supported in law and fact and there the matter must end.
 
 
 19
 We agree with Harbor that the divestiture order may present a problem in feasibility and from the standpoint of its accomplishment. Harbor is required to restore McCann as a viable competitive entity. How this is to be done remains a mystery. It may be that Harbor is being required to do more than is physically possible or that the divestiture order is vague in some respects. The problems now presented seem hypothetical in the main and we suggest that the proper forum for resolution of problems which may occur in a good faith effort on the part of Harbor to comply with the order of divestiture should be the Commission.
 
 
 20
 The petition to review and set aside the cease and desist order against United based on 2(a) of the Act is granted and enforcement is denied. The petition to review and set aside the cease and desist order against Harbor based on 2(f) of the Act is granted and enforcement of the order is denied. The petition to review and set aside the divestiture order of the commission against Harbor based on 7 is denied and enforcement is ordered.
 
 
 
 [1]
 During the course of the proceeding before the Commission, United Fruit Company through merger became an unincorporated division of United Brands Company, and United Fruit Sales Corporation changed its name to Chiquita Brands, Inc
 Petitioner Harbor, the largest banana jobber in Southern California, was incorporated December 18, 1964, succeeding to a banana wholesaling business theretofore owned and operated by the Dominick Jebbia family. The evidence related to the activities and operations of both the Jebbias and Harbor.
 
 
 [2]
 'It shall be unlawful for any person engaged in commerce, in the course of such commerce, either directly or indirectly, to discriminate in price between different purchasers of commodities of like grade or quality, * * * where the effect of such discrimination may be substantially to lessen competition or tend to create a monopoly in any line of commerce, or to injure, destroy, or prevent competition with any person who either grants or knowingly receives the benefit of such discrimination, or with customers of either of them . . ..'
 
 
 [3]
 'It shall be unlawful for any person engaged in commerce, in the course of such commerce, knowingly to induce or receive a discrimination in price which is prohibited by this section.'
 
 
 [4]
 'No corporation engaged in commerce shall acquire, directly or indirectly, the whole or any part of the stock or other share capital and no corporation subject to the jurisdiction of the Federal Trade Commission shall acquire the whole or any part of the assets of another corporation engaged also in commerce, where in any line of commerce in any section of the country, the effect of such acquisition may be substantially to lessen competition, or to tend to create a monopoly . . ..'
 
 
 [5]
 'Upon proof being made, at any hearing on a complaint under this section, that there has been discrimination in price or services or facilities furnished, the burden of rebutting the prima-facie case thus made by showing justification shall be upon the person charged with a violation of this section, and unless justification shall be affirmatively shown, the Commission is authorized to issue an order terminating the discrimination: Provided, however, That nothing herein contained shall prevent a seller rebutting the prima-facie case thus made by showing that his lower price or the furnishing of services or facilities to any purchaser or purchasers was made in good faith to meet an equally low price of a competitor, or the services or facilities furnished by a competitor.'
 
 
 [6]
 Virtually all of the bananas consumed in the United States are produced in the tropical regions of the Western Hemisphere. Bananas are imported into the United States while still green. Immediately after importation, they are subjected to a specialized ripening process and thereafter marketed
 Specialized banana wholesalers (jobbers) engage in purchasing, ripening, selling, and distributing bananas in a given area. They are to be distinguished from general produce wholesalers and from direct-purchasing, self-processing and ripening retail grocery chains.
 In the early 1960's, Central American banana farms were affected by a malady known as Panama disease, which attacked the 'Gros Michael' banana strain. Shifts were made by major importers, Standard earlier than United, to the more varietal Cavendish banana, which was more resistant to Panama disease. Because the Cavendish banana was more easily bruised, the banana was taken from the stem in the tropics and shipped to market in 40-pound boxes as contrasted to the previous method of shipment where the bananas remained on the stem. Tropic-boxed bananas were viewed with some concern by jobbers, who felt chain stores, formerly largely dependent on jobbers, could now begin ripening their own bananas. Richway, one of the five chain-store organizations in Southern California that purchased directly from importers, began as early in 1934 ripening its own bananas. Two chains, Von's Grocery and Alpha Beta Acme, began ripening with the advent of the boxing program. In part, because of Standard's pioneering the tropic boxing system, Standard filled 92 per cent of the chain store purchases in Southern California.
 Bananas are sold at advance order (pre-order), seaboard and 'roller' prices. Some weeks before a ship is scheduled to arrive in port, the importer sets an advance order price for the fruit on that ship. Approximately two weeks prior to arrival, orders at the advance price are solicited from customers. A customer who places such an advance order price is able to guarantee his supply rather than risk the non-availability of excess fruit at lower prices. Cancellation cannot be made without penalty.
 During the week before a given ship arrives in port, the importers announce the price at which fruit not advance ordered on that ship will be sold at dockside. This 'seaboard price' is often the same as the advance order price. Depending on demand the seaboard price may be less, and in such a case, the advance order price is adjusted downward to the seaboard price. If demand is greater than anticipated, the seaboard price may exceed the advance order price.
 The third category, 'roller' price, refers to the price of unsold bananas which traditionally were loaded on rail cars and are now loaded on trucks, to be sold while en route to various destinations. The roller price is always lower than the advance order and seaboard prices. The longer the bananas remain unsold, the lower the roller price.
 
 
 [7]
 Harbor's purchases from the three importers (in Dollars)
 Year United Standard Driscoll
---- ------ -------- --------
1963 100% -- --
1964 85% 15% --
1965 75.2% 24.8% --
1966 77.8% 21.7% .5%
1967 80.8% 13.1% 6.1%
1968 75.8% 16.1% 8.2%
1969 (3 mos) 70.6% 21.2% 8.2%
1969 (5 mos) 55.1% 36.9% 8.2%