**ANDERSON FOREIGN MOTORS, INC., et al., Plaintiffs,**

v.

**NEW ENGLAND TOYOTA DISTRIBUTOR, INC., et al., Defendants.**

**Civ. A. No. 76–417–Mc.**

United States District Court,
D. Massachusetts.

July 10, 1980.

Donald B. Gould, Goodwin, Proctor & Hoar, Boston, Mass., for plaintiffs.

James D. St. Clair, Robert W. Mahoney, Hale & Dorr, Boston, Mass., for N. E. Toyota.

James F. McHugh, John J. Curtin, Jr., Bingham, Dana & Gould, Boston, Mass., for Toyota Motor Sales, U.S.A., Inc.

Allen Kezsbom, Steven Glickstein, Kaye, Scholer, Fierman, Hays & Handler, New York City, for New England Toyota.

## MEMORANDUM AND ORDER

GARRITY, District Judge.

After extensive briefing, affidavits and legal arguments, this court entered, on August 29, 1979,[1] a memorandum of decision on plaintiffs' motion, pursuant to Fed.R. Civ.P. Rule 64, for approval of the attachment of certain real property and assets, and their motion pursuant to Fed.R.Civ.P. Rule 65, for a preliminary injunction to limit the disposition of certain stock and assets of the defendant corporation. *Anderson Foreign Motors v. New England Toyota*, D.Mass.1979, 475 F.Supp. 973. At that time we approved the proposed attachment and conditionally granted the motion for preliminary injunction. In a procedural order entered contemporaneously with our decision we directed that no preliminary injunction would issue until evidence of (or a stipulation as to) the fair market value of the defendants' stock was filed with the court. Plaintiffs thereafter perfected at-

---

1. The case had been transferred by the Clerk in April, 1979, to Judge McNaught upon his assuming office; but as transferor judge we re- tained jurisdiction of all motions then under advisement.

tachments of $1,000,000 each on real property owned by New England Toyota (NET), and on the residence of George Butler, president of NET and a defendant in this suit.

On December 7, 1979, plaintiffs moved for approval of an attachment of additional real property, and for an equitable attachment in the form of a preliminary injunction directed to additional assets held outright and in trust by George Butler.[2] The procedural order referred to had not been implemented and a preliminary injunction had not yet issued.

In January 1980, new lead counsel entered their appearance on behalf of the defendants. Thereafter, in response to plaintiffs' December 1979 motions for additional relief, the defendants: (1) moved that the preliminary injunction granted by the August 29, 1979 decision not be entered; (2) moved that the attachment approved by the August 29, 1979 decision be vacated; and (3) opposed plaintiffs' motions to increase the amounts subject to attachment and preliminary injunction. As grounds for the motions to vacate our prior decision, defendants stated that their motions were based on issues of law and fact not previously presented to the court. When both parties' motions came on for hearing before Judge McNaught, he entered an order dated March 21, 1980, of which a self-explanatory copy is hereto attached as Appendix A. On March 27, 1980, defendants refiled their motions in this session and they were separately briefed.

At the commencement of our hearing on the various motions, plaintiffs filed notice that they were withdrawing their two motions seeking additional security, filed on December 7, 1979, and their motion for a Rule 65 preliminary injunction, which our August 29, 1979 decision had provisionally granted but which never was entered.[3] This rendered moot certain aspects of the defendants' pending motions. Still other aspects of defendants' motions raised issues that the parties had fully argued and briefed when plaintiffs first moved for preliminary relief—issues specifically addressed in the court's August memorandum of decision. To the extent the defendants here renew old arguments, or raise legal theories that could fairly have been presented when the court considered these questions nearly one year ago, we will not undertake once more a full dress explanation of the court's position except with respect to the critical question of "the power of the court". We have, however, given fresh consideration to all grounds put forth by the defendants in their recent motions.

### Delivered Pricing and the Robinson-Patman Act

Defendants challenge the soundness of our prior finding that plaintiffs are likely to

2. As grounds for the additional attachment, plaintiffs explained that a leasehold interest which they had sought to attach in the amount of $5,000,000 had been terminated while the motion for attachment was being considered by the court.

3. Plaintiffs' decision to withdraw the motion for preliminary injunction seems to us well taken. In its August 1979 memorandum of decision, which is reported at 475 F.Supp. 973, the court sua sponte addressed the question of its authority to order a Rule 65 preliminary injunction as a form of equitable attachment over defendants' stock. The precise issue had not been argued or briefed by the parties. At the time, we proposed alternative bases for our power to order the requested form of preliminary injunction. Each depended on whether we took a narrow or broad view of the phrase, ". . . and other corresponding or equivalent remedies", in Rule 64—a point apparently not settled under the present state of the law. See 475 F.Supp. at 977. Defendants correctly point out in their recent memorandum, however, that on the question of the scope of state law remedies we incorrectly distinguished the case of Daley v. Ort, D.Mass.1951, 98 F.Supp. 151, which denied a motion for equitable attachment prior to verdict. Had we had the occasion to rule now directly on this point, which we would have had if plaintiffs had not withdrawn their motion for preliminary injunction, we probably would have changed that aspect of our prior decision and denied the injunction. Massachusetts law permits equitable attachment—in this instance, presented in the form of a preliminary injunction—only in actions founded upon a debt, which this action is not. Mass.G.L. c. 214, § 3(7). See, H. G. Kilbourne Co. v. Standard Stamp Affixer Co., 1913, 216 Mass. 118, 103 N.E. 469; Daley v. Ort, supra, at 152.

succeed on the merits of their claim that NET's practices constitute an illegal tie-in. Their main argument, based on selective citations from case law on the Robinson-Patman Act, suggests that by ruling that NET's sales and delivery practices might violate the Sherman Act, we condemn all delivered pricing systems and we force the defendants to adopt pricing practices that violate the Robinson-Patman Act. In our view, this argument misconceives the law on delivered pricing and misapprehends the proper relation of the Sherman Act to the Robinson-Patman Act.

■ In a theoretical sense, delivered pricing, whether it takes the form of a basing point price, equalized freight, or a uniform delivered price, discriminates among purchasers of the delivered product. Buyers closest to the seller's plant pay more than the actual cost to the seller of transporting the product. Buyers furthest from the plant pay less than the actual cost—the seller and nearby buyers in effect absorb the excess cost of freight. *See generally*, Von Kalinowski, 9 Antitrust Laws and Trade Regulation, § 68.02. Generally, where one competing purchaser is favored over another, directly or indirectly, in the price of a product, the seller may be in violation of section 2(a) of the Robinson-Patman Act. 15 U.S.C. § 13(a). But where a uniform delivered pricing system makes the actual or final price the same for all buyers, at all points of delivery, then competing buyers pay the same "delivered" price, and it is the position of the Federal Trade Commission that the Robinson-Patman Act is not violated. Von Kalinowski, *supra*, § 68.02[4], n. 34; *Federal Trade Comm'n v. A. E. Staley Mfg.*, 1945, 324 U.S. 746, 757, 65 S.Ct. 971, 976, 89 L.Ed. 1338.

From this proposition, that a uniform delivered pricing system does not violate section 2(a) of the Robinson-Patman Act, defendants have, in effect, derived two corollaries: (1) if delivered pricing is legal conduct for purposes of the Robinson-Patman Act, it must be legal for purposes of all other anti-trust laws; and (2) because delivered pricing (in its purest form) has been given FTC approval, sellers who deviate from a delivered pricing system do so at the peril of violating the Robinson-Patman Act.

■ To hold that certain business conduct is legal under the Robinson-Patman Act neither immunizes that conduct from Sherman Act scrutiny, nor makes such conduct, in every one of its manifestations, legal under the Robinson-Patman Act. For example, competing sellers who through collusion adopt delivered pricing systems in order to maintain uniform pricing in the industry violate both the Sherman Act and the Federal Trade Commission Act. *Federal Trade Comm'n v. Cement Institute*, 1948, 333 U.S. 683, 691, 720, 68 S.Ct. 793, 798, 799, 92 L.Ed. 1010; *Chain Institute v. Federal Trade Comm'n*, 8 Cir. 1957, 246 F.2d 231, 236–38. When delivered pricing takes the form of a basing point system that includes unearned or phantom freight, the resulting price differentials violate section 2(a) of the Robinson-Patman Act. *Corn Products Co. v. Federal Trade Comm'n*, 1945, 324 U.S. 726, 734, 65 S.Ct. 961, 965, 89 L.Ed. 1320; *Federal Trade Comm'n v. A. E. Staley Mfg.*, 1945, 324 U.S. 746, 758, 65 S.Ct. 971, 976, 89 L.Ed. 1338. And where a seller deviates from an otherwise legal, uniform, and consistently applied delivered pricing schedule, in order to grant a favored customer a special freight allowance, that conduct is also actionable price discrimination.[4] *Guy-*

4. Hence the rule regarding backhaul allowances. *See* 85 F.T.C. 1174 (1975). Since the backhaul issue was raised by defendants' counsel at the hearing on the pending motions, the rule bears restating. If a seller adopts a uniform delivered pricing system, its pricing options must be "(1) uniform, and (2) available to all customers on a non-discriminatory basis." 85 F.T.C. at 1176. While the delivered pricing system is in operation, a backhaul allowance to one customer is illegal; a non-discriminatory option offered to all customers to purchase at an alternative f. o. b. price is not. Thus an improper backhaul allowance involves selective deviation from a delivered pricing system once it's in place. It is not the equivalent, as defendants seem to suggest, of charging a uniform mill or base price for the product and either adding a delivery charge according to the distance of the purchaser from the plant, or per-

*ott v. Texaco Inc.,* D.Conn.1966, 261 F.Supp. 942, 949; *American Can Co. v. Bruce's Juices,* 5 Cir. 1951, 187 F.2d 919, *cert. den.* 342 U.S. 875, 72 S.Ct. 165, 96 L.Ed. 657; FTC Advisory Opinion No. 147, October 24, 1967, Statement of Clarification, December 26, 1973, 1973–1976 Transfer Binder, Trade Reg.Rep. (CCH) ¶ 20,498. Thus, even though delivered pricing, when properly applied, has received the tentative approval of the FTC, the fact that certain aspects of a firm's conduct are legal under one body of antitrust law does not make the sum of a firm's conduct immune from scrutiny according to other standards of competitive conduct contained in the antitrust laws. It is noteworthy that in the cases defendants cite for a line of authority on this question, the delivered pricing practices at issue in each case were held to violate one or more provisions of the antitrust laws.

■ It makes even less sense to argue that because uniform delivered pricing is legal under the Robinson-Patman Act defendants are required to engage in it. It is not the position of the FTC, as defendants state in their memorandum, that a seller violates the Robinson-Patman Act when it makes allowances based on actual freight cost, or when it offers a price based on f. o. b. shipping point. Rather, it is the position of the FTC that once the choice is made to offer uniform delivered price, the seller cannot depart from the established price schedule to grant freight allowances selectively to individual, favored purchasers.

> [A]lthough the granting of "backhaul" allowances (based on the customer's actual freight costs) by a seller using a uniform zone delivered pricing could indeed raise Robinson-Patman questions, a non-discriminatory option offered by such a seller to all customers to purchase at a true f. o. b. shipping point price would not.

mitting *all* purchasers to contract independently for delivery.

5. The quoted opinion clarified an earlier advisory opinion to the General Foods Corporation. In the course of the clarification the FTC noted that the legality or illegality of the delivered price system chosen by General Foods was not

Clarification of Ruling, "Backhaul" Allowances, 1975, 85 F.T.C. 1176.[5]

NET had the choice of a number of alternative systems of delivery pricing. Its pre-1972 practice was to subcontract the transportation function and bill the dealers for the costs. NET could have selected among independent carriers chosen by the dealers themselves, or it could have selected the independent common carriers according to certain identifiable standards, thus allowing for differences in actual cost of transportation yet maintaining central control over delivery. *See Crawford Transport Co. v. Chrysler Corp.,* E.D.Ky.1962, 235 F.Supp. 751, aff'd, 6 Cir. 1964, 338 F.2d 934, *cert. denied* 1965, 380 U.S. 954, 85 S.Ct. 1088, 13 L.Ed.2d 971. Without here deciding the question, it would seem that either of these delivery alternatives would, on the one hand, offer a "non-discriminating system, giving to purchasers, who have the natural advantage of proximity to [the] plant, the price advantages which they are entitled to expect over purchasers at a distance," *A. E. Staley, supra,* 324 U.S. at 757, 65 S.Ct. at 976, and, on the other hand, reduce to a minimum NET's intrusion into the market for the sale of delivery services.

■ Delivered pricing is only an incidental feature in one of two product markets that, taken together, make up the conduct of NET that plaintiffs challenge under the Sherman Act. NET's delivered pricing system may or may not withstand the Robinson-Patman analysis applied in the above-cited cases—plaintiffs make no claim of price discrimination or collusion, so a judgment on that issue is probably unnecessary in this case. Even assuming that the pricing system NET used in the tied product—sales of delivery services—did not discriminate among purchasers, our analysis of the anti-competitive effect of tying two product markets still stands.

at issue. At issue was only whether General Foods could follow a delivered price system with respect to one set of purchasers, while it offered freight-related allowances to private carrier customers positioned to take "dock" delivery. 85 F.T.C. at 1175.

## Court's Authority to Order Provisional Remedy

Since the plaintiffs have withdrawn their motion for a preliminary injunction, all that remains to be considered is the court's authority to approve attachments of defendants' realty and personal property, pursuant to Fed.R.Civ.P. Rule 64. Defendants have challenged the court's power to order attachment on three grounds: first, that Section 16 of the Clayton Act embodies all possible remedies, and the provisional remedy of attachment is not among them; second, that the qualifying language of Rule 64—"any existing statute of the United States governs"—makes the antitrust laws the exclusive source for all remedies, permanent and provisional; third, that Massachusetts law does not permit attachment in antitrust cases.

On the general subject of provisional relief, defendants argue that Section 16 of the Clayton Act enumerates specific equitable remedies for private parties in an antitrust action and that the prejudgment relief plaintiffs seek is not among them. Defendants fail, however, to distinguish provisional remedies from the relief ultimately to be granted. In each of the cases relied upon by defendants in their memorandum, the plaintiffs sought as the final order of the court equitable remedies that clearly went beyond the forms of substantive remedies contemplated by the antitrust laws. See, for example, *In re Multidistrict Vehicle Air Pollution*, 9 Cir. 1976, 538 F.2d 231, in which plaintiffs requested, *inter alia*, that defendants in a restraint of trade action establish a program for testing automobile emissions, and that they retrofit cars with pollution control devices. The court held that as a form of final relief, such remedies did not serve to restore competition and hence were outside the scope of Section 16 of the Clayton Act. *See also, Nashville Milk Co. v. Carnation Co.*, 1958, 355 U.S. 373, 78 S.Ct. 352, 2 L.Ed.2d 542. The fact that Section 16 of the Clayton Act might restrict the types of final remedies available to a successful antitrust plaintiff has no bearing on the power of the courts to order provisional relief in order to preserve the value of the final remedy or to protect the court's jurisdiction.

■ The ultimate issue presented, therefore, is whether this court has the power under Fed.R.Civ.P. Rule 64 to approve the attachment of an antitrust defendant's property in order to secure satisfaction of an eventual judgment. We note at the outset that the case of *DeBeers Consolidated Mines, Ltd. v. United States*, 1945, 325 U.S. 212, 65 S.Ct. 1130, 89 L.Ed. 1566, relied on by defendants, is inapposite to this remaining question. In *DeBeers* the United States specifically disclaimed any benefit of Rule 64. 325 U.S. at 218, 65 S.Ct. at 1133. It did so because Rule 64 requires the district court to look to applicable state law—under New York law which governed in that case, an attachment could issue only in an action seeking a money judgment, whereas the Government's action sought relief solely in equity. Related cases here cited by the defendants are similarly inapposite.[6]

We therefore look to applicable federal and state law. We are not persuaded by the defendants' argument that the federal antitrust laws impliedly exclude traditional forms of provisional relief because, when Congress set out in these statutes the possible forms a final remedy could take, it did not also mention the availability of provisional remedies.[7] Moreover, it is simply too

---

**6.** In *ITT Community Development Corp. v. Barton*, 5 Cir. 1978, 569 F.2d 1351, for example, nothing in the Florida law on garnishment authorized a court to order funds paid into the registry of the court to secure payment before judgment was entered.

**7.** We are confused by the citation to *Bruce's Juices, Inc. v. American Can Co.*, 1946, 330 U.S. 743, 67 S.Ct. 1015, 91 L.Ed. 1219, upon which defendants have in part based their statutory construction of the Clayton Act. *Bruce's Juices* construed only the Robinson-Patman Act. At issue in that case was whether the plaintiff-buyer should be allowed to seek as a *final* remedy a declaration from the court that certain notes could not be collected on by the defendant-seller who was found to have violated the Robinson-Patman Act. Such a remedy, in the Court's view, was clearly outside the

superficial a reading of Rule 64 to take the qualifying language, "subject to . . . any existing statute of the United States governs to the extent to which it is applicable," to mean, as suggested by the defendants, that the antitrust laws, as existing federal statutes, state not only the substantive law on competition but the relevant rules of practice, jurisdiction, and procedure as well. The above-quoted qualification to the provisions of Rule 64 is commonly understood to refer only to federal statutes dealing specifically with the provisional remedies of attachment, garnishment or arrest. *See, e. g.,* 12 U.S.C. § 91 (national banks immune from attachment); 40 U.S.C. § 308 (property of United States not subject to attachment); 46 U.S.C. §§ 563, 601 (Seaman's clothing and wages not subject to attachment). *See generally,* Moore's, Federal Practice, ¶ 64.07[3]. Accordingly, we conclude that neither Section 4 nor Section 16 of the Clayton Act works to restrict the court's power to approve an attachment in this action in accordance with Fed.R.Civ.P. Rule 64.

■ Massachusetts Rule of Civil Procedure 4.1(a) provides for attachments subsequent to the commencement "of any action." Providing other requirements of the rule have been observed, as has been done in the instant case, the rule contains no limitation, express or implied, as to the type of action in which attachment may be ordered. To the best of our knowledge, no provision in Massachusetts law proscribes prejudgment attachment in actions seeking money damages. In this respect, state law varies widely. As explained in 7 Moore's Federal Practice, ¶ 64.04[3],

> Some states are definitely "creditor" states in which the provisional remedies are generally available for all types of legal claims and with few restrictions; others are as definitely "debtor" states in which the provisional remedies are available only for certain types of legal claims

and are subject to many restrictions relative to affidavits, bonds, and related matters; and still other states are somewhere between those extremes in varying degrees.[10]

[10] The New England states traditionally have been in the main "creditor" states.

Many of the cases cited by the defendants are from jurisdictions whose statutes specifically limit attachment to actions in contract. *See, e. g., Crist v. United Underwriters, Ltd.,* 10 Cir. 1965, 343 F.2d 902; *McCall v. Superior Court,* 1934, 1 Cal.2d 527, 36 P.2d 642. Other cited cases state in passing that the court must find explicit statutory authorization to attach but deal principally with points of law wholly apart from the attachment issue. *See, e. g., Investors Royalty v. Market Trend Survey,* 10 Cir. 1953, 206 F.2d 108; *Stowe v. Matson,* 1949, 94 Cal.2d 678, 211 P.2d 591.

Our omission to require a bond from plaintiffs in connection with the attachments in the instant case was intentional. First, Rule 4.1 makes no provision for a bond. Second, a bond patterned after the conditions specified in Rule 65(c), Fed.R. Civ.P., would be inappropriate here, because an order granting an attachment is not an appealable order under 28 U.S.C. § 1292. *See, West v. Zurhorst,* 2 Cir. 1970, 425 F.2d 919. Thus there appears to be no mechanism for determining that the defendants' property has been wrongfully attached and awarding damages on that basis. An order approving an attachment does not adjudicate matters relevant to the main claim. On appeal, the plaintiffs could be reversed for any number of reasons on the merits of their claims but reversal would in no way reflect on the correctness of the decision to approve attachment. A Rule 65(c) bond, on the other hand, serves a specific, corrective purpose and that purpose depends on the availability of appellate review. This absence of appellate review should serve to restrain trial courts in ordering attach-

intended purposes of the Robinson-Patman Act. The case does not deal either with the

Sherman or Clayton Acts, or with the *provisional* remedy of prejudgment attachment.

ments; and we have taken this into account in our rulings in this case.

### Scope of the Attachment

Upon the filing of our memorandum and order of August 29, 1979, plaintiffs were able to perfect attachments on $2 million of defendants' real property. But they were unable to perfect an additional attachment of $5 million on a leasehold in Woburn because the leasehold interest was terminated before the attachment was approved. By denying defendants' motion to vacate we have here upheld the validity of the $2 million attachments already perfected. This, however, is all that remains of the orders entered August 29, 1979, by virtue of plaintiffs' withdrawal on May 19, 1980 of their applications for a preliminary injunction, equitable attachment, additional security and discovery of defendants' assets.

. One loose end calls for a further ruling: since the court's 1979 memorandum and order approved attachments up to a value of $7 million and only $2 million worth has been perfected, has the court ordered implicitly that plaintiffs have a roving commission to attach whatever property of the defendants they may discover in order that they may make up the $5 million shortfall? The question has been presented in the form of a draft order attached to plaintiffs' post-hearing memorandum filed May 23, 1980 requesting a general attachment directed to all of defendant NET's assets, subject to prior notice and further applications to the court. The answer is that we do not make such a conditional order. The propriety of attachments depends on the attendant circumstances, including the apparent strength of the plaintiffs' case and the location, current use, valuation and current interests in property sought to be attached. Whether future developments in this litigation will warrant additional attachments remains to be seen. In any

event, new applications and hearings will be necessary.

### Other Related Issues

Defendants have presented numerous additional grounds in support of their motion to vacate our August 1979 order. They challenge the method of calculating potential damages, plaintiffs' proof of "antitrust injury", and defendants' economic power and market share; they propose a pass-on defense and possible business justifications for their conduct; and they argue anew the separate product analysis which we fully explored in our 1979 memorandum. Many of these issues will be further developed in the course of pretrial discovery; some may at a later date serve as grounds for motions to dismiss or for summary judgment. However, we are satisfied that the parties had ample opportunity to present these issues when we first considered plaintiffs' application for preliminary relief and that our decision to approve, once again, plaintiffs' motion for attachment is fully supported on the record and the arguments presented to date.

### Conclusion

By reaffirming its order of August 1979 based upon Rule 64, Fed.R.Civ.P., the court has made no final rulings on the ultimate merits of the respective positions of the parties. The question of a plaintiff's likelihood of recovering judgment in an amount greater than the amount of an attachment is, like findings on an application for a preliminary injunction, in essence preliminary and subject to revision in the light of changed circumstances.

Defendants' motion to vacate the $2 million attachment approved August 29, 1979 is accordingly denied. Plaintiffs' request for a general attachment of defendant NET's assets up to $7 million is also denied.

Appendix to follow.

APPENDIX A

McNAUGHT, District Judge.

The defendants in the above entitled case arguing before me that the attachment and injunction issued by Judge Garrity were "beyond the power of the court to issue".

I refuse to act in this matter. I will not review any action taken by Judge Garrity prior to reassignment of this case.

I grant leave to defendants to ask for a rehearing by Judge Garrity. Such request for rehearing addressed to Judge Garrity must be filed within 14 days from date.