BOSTON TRADING GROUP, INC. and Northeast Investment Services, Inc., By the Temporary Receiver, Michael A. COLLORA

v.

John W. CARTER and Michelle Carter.

Civ. A. No. 83–0001–Z.

United States District Court,
D. Massachusetts.

April 18, 1983.

Michael A. Collora, R. Gregg Stone, Hemenway & Barnes, Boston, Mass., for plaintiffs.

Kenneth A. Sweder, Kathleen L. Torres, Kaye, Fialkow, Richmond & Rothstein, Boston, Mass., for defendants.

## MEMORANDUM OF DECISION

ZOBEL, District Judge.

This is an action brought by a court-appointed receiver on behalf of Boston Trading Group, Inc. ("BTG") and Northeast Investment Services, Inc. ("NIS"). The defendants are John W. Carter ("Carter"), formerly the owner of BTG, and his wife Michelle Carter. On January 4, 1983, this Court issued a temporary order restraining defendants from negotiating, pledging, selling or otherwise transferring a treasurer's check for $101,562.50, as well as writs for trustee process on two bank accounts totalling approximately $9,000, and for an attachment of defendants' real estate to the amount of $200,000.[1] Defendants have

**1.** The attachment is of limited value because the property, which was purchased for $200,000, is already subject to a mortgage and unrelated attachments totalling approximately $400,000.

moved to dissolve or reduce the attachments.[2]

There are four showings which a plaintiff must make in order to secure a preliminary injunction. The Court must find (1) that plaintiffs have demonstrated a likelihood of success on the merits; (2) that plaintiffs will suffer irreparable injury if the injunction is not granted; (3) that this injury will be greater than any sustained by the defendants if the injunction issues; and (4) that the public interest will not be adversely affected by the granting of an injunction. *Planned Parenthood League of Massachusetts v. Bellotti,* 641 F.2d 1006, 1009 (1st Cir.1981). A showing of a "reasonable likelihood" of success on the merits is required for the issuance of a writ of attachment or of trustee process. Massachusetts Rules of Civil Procedure 4.1 and 4.2.

Many of the facts relevant to this case were outlined in this Court's Memorandum of Decision of January 26, 1983 in *Boston Trading Group, Inc., et al. v. Robert E. Burnazos, et al.,* Civil Action No. 82–2440–Z, a related action. The following additional facts which are not in dispute are relevant to the pending motions.

In 1978, Carter purchased Precious Metal Associates ("PMA"), a company which solicited investment funds from the general public. Later that year he purchased BTG, then a corporate shell with no assets, from Terry Young ("Young") for $500.00.

In February 1979, Carter sold all the stock of BTG to Robert Burnazos ("Burnazos"), who was then BTG's president. The sale price was $600 payable upon signing plus $60,000, payable in five annual installments of $12,000 each. One month later, the contract was amended to provide for a $200,000 lump sum payment after five years. But apparently, if BTG were to be sold before then, Carter was to receive from Burnazos $200,000 or 25% of the proceeds in excess of $200,000, whichever was less. At his deposition Burnazos testified that BTG's only asset at the time of sale was an employment contract with Young which was terminable upon 45-days notice. In fact, Young did no or almost no work for BTG after it was purchased by Burnazos. Burnazos stated also at his deposition that he and Carter orally agreed that BTG would be able to buy PMA's client list and the managed accounts of PMA's customers.

In September 1979, Carter engaged an attorney to serve as the assignee in an assignment for the benefit of the creditors of PMA, which had become the focus of an investigation by the Commodity Futures Trading Commission. He secured a valuation of PMA's client list from Sidney Becker ("Becker"), the president of a "Clearing Member Firm of the Chicago Mercantile Exchange and the International Monetary Market." Becker valued the list at $5,040, stating in his one page report that he assumed that there was no guaranty or assurance that the accounts of the clients would be transferred. On September 4, BTG bought the client list for $5,401. Three days earlier, however, Carter had written to all of PMA's clients that the managed accounts of PMA customers had been transferred to BTG. At the time, PMA owed its creditors $680,000 and had assets of $42,-332.41.[3]

At some point thereafter, Burnazos agreed to pay to Carter half of the proceeds of any future sale of BTG. Carter received $345,000 of the $873,236.37 which Burnazos realized from the sale of BTG to Richard M. Shaw and C. Theodore Kepreos. Of this amount, $235,000 has either been spent or remains unlocated by the receiver.

The facts, as stated here and in the Memorandum of Decision of January 26, lead me to conclude that there is a substantial and reasonable likelihood that plaintiffs will

---

**2.** Plaintiffs have moved to convert the temporary restraining order into a preliminary injunction. However, because the check was subsequently deposited, per order of this Court, and with consent of the parties, in an interest bearing account in the name of the Clerk of this Court, consideration of plaintiff's motion is unnecessary.

**3.** To the extent that the evidence shows that PMA's creditors may have been defrauded, their claims are not before me.

succeed in having rescinded as fraudulent the transfer of a large part if not all of the $345,000 paid by Burnazos to Carter and his wife. A transfer is fraudulent as to creditors if it is made without fair consideration by a person who is insolvent or will thereby be rendered insolvent. Mass.Gen.Laws ch. 109A § 4. In the Memorandum of Decision of January 26, I determined that there was a substantial likelihood that plaintiffs would prevail in their claim that Burnazos received at least $473,236.37 through fraudulent transfers. Since the stocks and bank accounts belonging to Burnazos and attached or restrained from transfer total only $319,146.51, it is likely that his transfer of funds to Carter will prove to have rendered Burnazos insolvent for purposes of satisfying plaintiffs' claim. $145,000 of the $473,236.37 was transferred to Carter or to his wife. Carter had already received $200,000 from the sale of BTG, despite the fact that he was entitled to receive only $60,600 under the original sale contract and only $168,000 (20% of the proceeds in excess of $200,000) under the amended contract. There is no indication that any additional consideration was given to Burnazos at the time the first amended contract was signed or when Burnazos agreed to give Carter half of the proceeds of any sale.[4] Plaintiffs are, therefore, likely to prevail in their claims against Carter at least to the amount of $145,000.[5]

I find also that if an injunction is not issued, plaintiffs will suffer irreparable harm greater than the harm which will be suffered by the defendants upon the issuance of an injunction. The clients of BTG and NIS have already lost several million dollars through the fraudulent ac-

tions of Richard M. Shaw[6] and the allegedly fraudulent actions of C. Theodore Kepreos. Carter admits that most of the $345,000 which he received from Burnazos has already been dissipated. It does not appear likely that Carter will receive substantial income in the future. Should an injunction not issue and plaintiffs prevail, they will have no adequate remedy at law other than the funds belonging to Burnazos and already attached or restrained from transfer. These funds are inadequate to satisfy the claims against Burnazos and Carter.

Although Carter is seriously ill and has incurred significant medical expenses, he receives $3,000/month in disability payments and owns property which can be rented for $3,400 per month. Moreover, he has refused to provide financial information to the plaintiffs and neither he nor his wife has agreed to appear for a deposition. Should Carter urgently require funds for a specific purpose, he may present supporting financial information in an application to the Court. I have already ordered $4,485.00 released in a tuition payment for one of his children.

I further find that the documents presented indicate that the public interest will in no way be adversely affected by the issuance of an injunction.

In accordance with the above, defendants' motion to dissolve or reduce the attachments is denied, except that, because there is a substantial likelihood that plaintiffs will recover at least $145,000, but probably not more than that amount, the attachment on the defendants' real estate will be reduced to $35,000.

---

4. Although Burnazos claimed at his most recent deposition that the oral amendment to their contract was in consideration for various services performed by Carter for BTG, there is no documentation to support this. During November 1979, BTG paid Carter $51,000, and in 1981 it paid $90,000 to Carter through Media and Marketing Management Co. It is unclear what services, if any, Carter performed to justify these payments.

5. As to the $145,000, plaintiffs are also likely to prevail because the deposition testimony of

Burnazos indicates that he kept Carter fully informed of his attempts to secure payment from Shaw and Kepreos for the sale of BTG. It is thus likely that Carter knew of the fraudulent intent of the buyers of BTG, at least as of the time when the final payment to Burnazos ($400,000) was made.

6. On January 20, 1983, Shaw pleaded guilty to one count each of mail fraud, wire fraud, and fraud by a commodity pool operation.