The AETNA CASUALTY AND SURETY COMPANY, Plaintiff,

v.

RODCO AUTOBODY, et al., Defendants.

Civ. A. No. 89–2180–N.

United States District Court,
D. Massachusetts.

July 15, 1991.

Giovano Ferro, II, Newton, Mass., for Rodco Autobody, Petros Arhaggelidis and Betty Arhaggelidis.

Barry S. Scheer, Sarrouf, Tarricone & Flemming, Boston, Mass., for Atlas Autobody, Kathleen Barron and Abdulla Swei.

William Spallina, Newton, Mass., for Zareh Tirinkian, Lena Tirinkian, Jack Markarian, Peter Markarian, Tarja Markarian and Arsenal Auto Repairs.

Nicholas Foundas, Eisenstadt & Foundas, Boston, Mass., for Georgious Boutalis and Konstantine Boutalis.

Anthony M. Traini, Rosemary Anne Traini, Randolph, Mass., for Timothy J. Cummings.

Robert M. Gilligan, Singer & Singer, Medford, Mass., for Edward G. Ryan.

Joseph S. Carter, Boston, Mass., for Ahmad Samadi.

Thomas N. O'Connor, Hale & Dorr, Boston, Mass., and Ralph Stein, Salem, N.H., for Armen's Autobody, Armen Toukhmanian and Arthur Toukhmanian.

Paul Kaplan, Boston, Mass., for Rahim Nima.

J. Sheffield Dow, Boston, Mass., for Nikolas Grigoriadis, Rami Nima Jabbari, Abdel Quader Alshrafi and Mohamad El Ghazzaowi.

David J. Kerrigan, Mahoney, Hawkes & Goldings, Boston, Mass., for Mohammad Haghighi.

Harris G. Gorab, Law Office of Harris G. Gorab, Boston, Mass., for Alireza Haghden, Amir Lajervardi and Julie Grover.

James P. Duggan, Boston, Mass., for John Sheehan.

ORDER RE: MOTION TO DISSOLVE *EX PARTE* ATTACHMENTS OF DEFENDANTS ARSENAL AUTO REPAIRS, INC., ZAREH TIRINKIAN, LENA TIRINKIAN, JACK MARKARIAN, PETER MARKARIAN, TARJA MARKARIAN, AND HAROUTIOUN MARKARIAN (DOCKET ENTRY # 217)

MARIANNE B. BOWLER, United States Magistrate Judge.

The Aetna Casualty & Surety Company (hereinafter "Aetna") brought this action

David O. Brink, Byrnes Smith & Brink, Quincy, Mass., and John P. Graceffa, Gallagher & Gallagher, P.C., Boston, Mass., for Aetna Casualty & Sur.

against numerous defendants, consisting of individuals and autobody shops, for violation of the Racketeer Influenced and Corrupt Organizations Act (hereinafter "RICO") (18 U.S.C. §§ 1961, *et seq.*) based upon alleged fraudulent insurance claims submitted by the defendants.

The complaint in the instant action was filed on October 2, 1989. On the same day the plaintiff, Aetna, filed forty-five *ex parte* motions for trustee process and attachment with respect to bank accounts and real estate of the defendants. These motions were allowed by the district judge to whom this case is assigned without a hearing. The above named defendants (hereinafter the "Arsenal defendants"), whose assets have been attached, have moved to dissolve the *ex parte* trustee process and attachment orders on the basis that the plaintiff cannot prove the existence of a reasonable likelihood of recovering a judgment against the Arsenal defendants. Specifically, the Arsenal defendants moved to dissolve the following attachments: (1) the *ex parte* attachment by trustee process of Lena Tirinkian for Coolidge Bank and Trust (Docket Entry # 41); (2) the *ex parte* attachment on the real estate of Lena and Zareh Tirinkian consisting of 102 Long Meadow Road, Belmont, Massachusetts (Docket Entry # 58); (3) the *ex parte* attachment on real estate of Zareh Tirinkian held as trustee consisting of 59 Channing Street, Belmont, Massachusetts (Docket Entry # 59); (4) the *ex parte* attachment by trustee process of Arsenal Auto Repairs, Inc. (hereinafter "Arsenal") for Coolidge Bank and Trust (Docket Entry # 06); (5) the *ex parte* attachment by trustee process of Zareh Tirinkian for Coolidge Bank and Trust (Docket Entry # 20); (6) the *ex parte* attachment of the 1976 Rolls Royce, VIN 24110 belonging to Zareh Tirin-

kian (Docket Entry # 54)[1]; and (7) the *ex parte* attachment by trustee process of Tarja Markarian and Haroutioun Markarian for Bank of New England North. (Docket Entry # 22).[2]

Pursuant to the request of the parties, this court held numerous evidentiary hearings with respect to this motion.[3] At the evidentiary hearing on January 29, 1991, this court directed counsel to file proposed findings of fact, rulings of law, and memoranda of law within twenty-one days from receipt of the last transcript. After several procedural inquisitions this court finally received all of the requested filings on or about May 6, 1991, albeit not as comprehensive as expected in a case of this complexity, and the court, accordingly, now addresses the merits of the motion in question.

## DISCUSSION

■ Fed.R.Civ.P. 64, which governs the procedure pursuant to the prejudgment remedies of attachment and trustee process, provides in pertinent part:

> all remedies providing for seizure of person or property for the purpose of securing satisfaction of the judgment ultimately to be entered in the action are available under the circumstances and in the manner provided by the law of the state in which the district court is held, existing at the time the remedy is sought.

*Id.* Mass.R.Civ.P. 4.1 and 4.2 articulate the state statutes controlling motions for attachment and trustee process. In order to enter an order of approval of an attachment or trustee process, the court must find the existence of a reasonable likelihood that the plaintiff will recover judgment in

---

1. The defendant subsequently, on January 15, 1991, filed a motion to dissolve the *ex parte* attachment of Zareh Tirinkian's 1976 Rolls Royce, VIN 24110 to which the plaintiff assented. (Docket Entry # 754). The instant motion is, therefore, moot at this time insofar as it concerns the above stated attachment.

2. This court recognizes that the *ex parte* motions for attachment and attachment by trustee process include an amount far in excess of the

value of the property actually attached. For purposes of the present motion, this court will base its analysis on the value of the property actually attached.

3. This court held evidentiary hearings with respect to the motion in question on the following dates: June 29, 1990; July 27, 1990; August 22, 1990; October 2, 1990; January 16, 1991; January 17, 1991; and January 29, 1991.

an amount equal to or greater than the amount of the attachment exclusive of any liability insurance of the defendant. In the case of an *ex parte* attachment or trustee process, the court must also find one of the following: (1) the defendant is not subject to the personal jurisdiction of the court; (2) the existence of a clear and present danger that the defendant will convey, remove, conceal, damage, or destroy the property if notified in advance; or (3) in the case of trustee process, that the defendant, if notified in advance of the attachment on trustee process, will withdraw the goods or credits from the trustee and remove, conceal, or dissipate those credits. Mass. R.Civ.P. 4.1(f); 4.2(g).

■ Mass.R.Civ.P. 4.1(g) and 4.2(h) provide the procedure with respect to the dissolution of *ex parte* attachments.[4] The initial burden at the hearing, with respect to the dissolution of an *ex parte* attachment, rests upon the defendant to introduce sufficient evidence by testimony or affidavit to challenge any finding upon which the issuance of the *ex parte* order rested. *Id.* The burden then shifts back to the plaintiff to justify the imposition of an attachment as if the plaintiff had sought a hearing on the motion rather than proceeded in an *ex parte* fashion. *Id; see* 6 J. Smith & H. Zobel, *Massachusetts Practice, Rules Practice* 111, 128 (1974) (discussing procedure pursuant to prejudgment remedy of attachment).

This court is of the opinion that the affidavits submitted by the defendants (Docket Entry ## 218; 219; 220; 221; and 222) are sufficient to challenge the findings necessary to impose an *ex parte* attachment. This court will, accordingly, adjudge the testimony presented at the numerous evidentiary hearings as if the plaintiff had sought the instant attachments with notice and a hearing. The burden, accordingly, rests upon the plaintiff to demonstrate the necessary predicates for the attachments.

### I. *Reasonable Likelihood of Recovering Judgment*

■ "[T]he central question on the motion for approval of attachment is whether plaintiffs are likely to prevail on the merits and obtain damages in the necessary amount." *Anderson Foreign Motors Corp. v. New England Toyota Distributor, Inc.,* 475 F.Supp. 973, 978 (D.Mass. 1979); *Anderson Foreign Motors Corp. v. New England Toyota Distributor, Inc.,* 492 F.Supp. 1383 (D.Mass.1980) (affirming order of attachment issued in 1979). A showing of reasonable likelihood of success on the merits is a prerequisite for court approval of an attachment. *Boston Trading Group, Inc. v. Carter,* 561 F.Supp. 1175, 1176 (D.Mass.1983). Mass.R.Civ.P. 4.1 and 4.2 are silent as to the quality of evidence or quantum of proof required to obtain court approval of an attachment.

Aetna filed the instant action against the Arsenal defendants and others based on violations of: RICO, sections 1962(c) and (d), (Counts I, II, IV, V, VI, VII, VIII and IX); civil conspiracy (Count X); common law deceit (Count XI); and Mass.Gen.L. ch. 93A, §§ 2 and 11 (Count XIII); breach of contract (Count XIV); breach of fiduciary duty against the "appraiser defendants" (Count XII).[5]

### A. RICO Claim

Several of the counts in the amended complaint, as noted above, allege violations of RICO based upon the defendants "racketeering" activity in connection with the submission of fraudulent insurance claims. The plaintiffs allege, in "Chain VIII" and Count VI of the amended complaint, that the Arsenal defendants engaged in several schemes to defraud Aetna in connection with the submission of fraudulent insur-

---

**4.** For purposes of the instant motion, the court will refer to the attachments and attachments by trustee process collectively as attachments unless otherwise specifically stated.

**5.** The plaintiff's original complaint was filed on October 2, 1989. Subsequently, on April 26, 1991, this court allowed the plaintiff's motion to amend the complaint to the extent that it pertained to the existing defendants. This court, accordingly, will refer to the amended complaint, rather than the original complaint, when it is necessary to refer to the complaint. Count III was deleted from the amended complaint.

ance claims which constitute a pattern of racketeering in violation of RICO, §§ 1961 and 1962(c).[6] Pursuant to Count VI of the amended complaint, Arsenal Autobody, Inc. is the alleged enterprise. The amended complaint further alleges, in Count VII that P & B Autobody (hereinafter "P & B"), Atlas Autobody (hereinafter "Atlas"), and Arsenal form an association in fact enterprise, and in Count IX, that P & B, Atlas, and Arsenal conspired with the appraiser defendants and each other in violation of 18 U.S.C. § 1962(d).

■ The plaintiff, in order to state a claim under RICO, must allege: (1) the existence of an enterprise engaged in or affecting interstate or foreign commerce; (2) a pattern of racketeering activity; (3) a nexus between the pattern of racketeering activity and the enterprise; and (4) a resulting injury to its business or property. *See Sedima, S.P.R.L. v. Imex Co.*, 473 U.S. 479, 496–98, 105 S.Ct. 3275, 3285, 87 L.Ed.2d 346 (1985) (stating elements of RICO violation); *see also Lincoln House, Inc. v. Dupre*, 903 F.2d 845, 846 (1st Cir. 1990) (discussing proof necessary to establish violation of RICO).

### (1) *Enterprise*

With respect to the instant defendants, the plaintiff charges that Arsenal constitutes an enterprise and that P & B, Atlas, and Arsenal form an association in fact enterprise. "The term 'enterprise' is defined as including 'any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity.'" *United States v. Turkette*, 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (quoting 18 U.S.C. § 1961(4)). "Section 1961(4) describes two categories of associations that come within the purview of the 'enterprise' definition. The first encompasses organizations such as corporations and partnerships, and other 'legal entities.' The second covers 'any union or group of individuals associated in fact although not a legal entity.'" *Id.* at 581–82, 101 S.Ct. at 2528.

■ The existence of such an "enterprise" is proved by evidence of a continuing organization and by proof that the individual associates function as an ongoing unit. *Id.* at 583, 101 S.Ct. at 2528. The enterprise "is an entity separate and apart from the pattern of activity in which it engages ... [t]he existence of [which] ... at all times remains a separate element which must be proved ..." *Id.* at 583, 101 S.Ct. at 2528.

■ Arsenal, having been a company organized for the purpose of performing mechanical and body work on automobiles, constitutes an "enterprise" for RICO purposes.[7] Zareh Tirinkian is the owner and President of Arsenal. (June 29, 1990 transcript, pp. 134 and 177). Lena Tirinkian is a director of Arsenal. (June 29, 1990 transcript, p. 92). Haroutioun Markarian and Jack Markarian worked at Arsenal autobody at relevant time periods.[8] (June 29,

---

**6.** 18 U.S.C. § 1962(c) provides in pertinent part:

It shall be unlawful for any person employed or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt.

*Id.* Section 1962(c) recognizes only an action against a defendant who, through a pattern of racketeering activities participates in the affairs of an enterprise other than itself. Such a claim cannot proceed if only one entity is identified as serving in both the perpetrator and enterprise roles.

**7.** The body shop's activities also have the requisite nexus with interstate commerce. The nexus may be demonstrated merely by proving that the defendants used an instrumentality of interstate commerce in executing their fraudulent scheme. The testimony and other evidence in this action demonstrates such a nexus in that the claims and loss notices were sent through the United States mails.

**8.** Haroutioun Markarian left Arsenal in March of 1988 and went to Quality European Autobody, Inc. where he was a partner with John Garabedian. (June 29, 1990 transcript, p. 48; p. 50). He then left Quality in October of 1988 and returned to Arsenal. (June 29, 1990 transcript, p. 51). Haroutioun Markarian, as of January 16, 1991, worked at Hi–Tech Autobody in Cambridge, Massachusetts as a body shop manager. (June 29, 1990 transcript, pp. 47–8; January 16, 1991 transcript, p. 91).

1990 transcript, pp. 3–4). In addition, Tarja Markarian has sufficient ties to Arsenal autobody and the other defendants to establish a reasonable likelihood of success on the merits with respect to her participation in the enterprise. Based upon the evidence adduced at the evidentiary hearings in this matter, this court is of the opinion that Aetna has demonstrated at least a reasonable likelihood of success on the merits with respect to the establishment of an enterprise and the participation of the instant defendants as individual associates in that enterprise.

The testimony of Mr. Tirinkian as well as that of Robert Hanna, an employee of Aetna, are sufficient to demonstrate a reasonable likelihood of success in establishing an enterprise consisting of a network of at least one corrupt appraiser and Arsenal autobody.[9] The testimony of Robert Hanna also supports the existence of a link between Arsenal, P & B and Rodco. (July 27, 1990 transcript, p. 205; August 22, 1990 transcript, pp. 168–73; *see generally* Affidavit of Robert Hanna (Docket Entry # 60)).

Although clearly issues of fact and law remain to be finally determined, the plaintiffs have, based upon the evidence presented at the hearings in question, sufficiently demonstrated a reasonable likelihood of success in establishing the existence of an enterprise through an association in fact involving P & B, Atlas, Arsenal and at least one Aetna appraiser.

In addition, the plaintiffs have provided sufficient evidence for this court to conclude that they have demonstrated a reasonable likelihood of success in establishing that the purpose of the enterprise was to defraud the plaintiff.

### (2) *Pattern of Racketeering Activity*

■ The definition of a pattern requires at least two acts of racketeering activity within a ten year period. 18 U.S.C. § 1961(5). "The target of [RICO] is thus not sporadic activity. The infiltration of legitimate business normally requires more than one 'racketeering activity' and the threat of continuing activity to be effective. It is this factor of *continuity plus relationship* which combines to produce a pattern." *Eastern Corporate Federal Credit Union v. Peat, Marwick, Mitchell & Co.,* 639 F.Supp. 1532, 1534 (D.Mass.1986) (citations omitted). A pattern may be established by allegations of: long term racketeering activity; continuing racketeering activity which is part of an entity's regular course of business; a long-term association that exists for criminal purposes; or where the acts alleged are part of a regular way of conducting an ongoing noncriminal business. *H.J., Inc. v. Northwestern Bell Telephone Co.,* 492 U.S. 229, 109 S.Ct. 2893, 2902, 106 L.Ed.2d 195 (1989).

■ In determining whether the acts alleged are sufficient to support a claim of racketeering activity, the court must consider the following factors: "(1) the number of independent victims; (2) the number of participants; (3) the purpose of the activity; (4) the result of the activity; (5) the method of commission; (6) the number of transactions; (7) whether the scheme is open-ended; and (8) the duration of the activity." *Framingham Union Hospital, Inc. v. Travelers Insurance Co.,* 721 F.Supp. 1478, 1484 (D.Mass.1989); *see State Farm Mutual Automobile Insurance Co. v. Rosenfield,* 683 F.Supp. 106, 110 (E.D.Pa.1988) (discussing requirements of proof for demonstration of pattern of racketeering activity).

■ The separate acts of racketeering must also reflect "continuity" and "relationship" in order to establish a pattern. "Continuity may be inferred from all of the surrounding circumstances, including the acts themselves or the nature of the enterprise." *H.J., Inc. v. Northwestern Bell Telephone Co.,* 109 S.Ct. at 2902. In addition, a relationship may be demonstrated through establishment of "the same or similar purposes, results, participants, victims, or methods of commission, or [that the

---

**9.** In addition, Mr. Tirinkian testified that he knew several of the Aetna appraisers, in particular, Tim Cummings, Steven Dexter, and Brian Louiseau, through his work at Arsenal. (June 29, 1990 transcript, pp. 170–1).

predicate acts] are interrelated by distinguishing characteristics and are not isolated events." *Fleet Credit Corp. v. Sion*, 893 F.2d 441, 445 (1st Cir.1990) (quoting *H.J. Inc. v. Northwestern Bell Telephone Co.*, 109 S.Ct. at 2901).

 Application of these factors to the instant action dictates that the plaintiff has demonstrated at least a reasonable likelihood of success on the merits of establishing the existence of a pattern of racketeering activity.

Specifically, the evidence presented at the hearings on the instant motion showed the following. Initially, with respect to the defendants, the Markarians, the testimony indicated that the Markarians submitted claims to Aetna with respect to two Mercedes: one claim for a 1970 Mercedes in March of 1988 and one for a 1981 Mercedes in December of 1988. (June 29, 1990 transcript, p. 38).[10] The Mercedes was in one of Haroutioun's shops during 1988. (June 29, 1990 transcript, p. 39). Mr. Markarian testified that the vehicles were repaired at the shop in which he was working at the relevant time period: the 1970 Mercedes was repaired at Quality; and the 1981 Mercedes was repaired at Arsenal. (June 29, 1990 transcript, pp. 55–6). When cross-examined, however, Mr. Markarian was unable to substantiate any purchase of parts for that repair work by either receipt or cancelled checks. (June 29, 1990 transcript, pp. 67–8). Mr. Markarian was again called for further testimony at the hearing on January 16, 1991, at which time he testified that he did receive receipts for parts purchased from Auto Engineering with respect to the 1970 Mercedes. He was unable to recall, however, what happened to the receipts. Upon further questioning by the attorney for the Arsenal defendants, Mr. Markarian recognized a document comprised of three pages as the parts for the 1970 Mercedes. (January 16, 1991 transcript, pp. 96–9; *see* Defendants' Exhibit # NN). At the present time this court is not persuaded, however, that the resurrection of the document delineating the parts for the 1970 Mercedes is sufficient to substantially undermine the plaintiff's likelihood of success on the merits with respect to the establishment of the aforementioned elements of violation of civil RICO. In addition, this court notes that Mr. Markarian did not produce any such document with respect to the claim concerning the 1981 Mercedes.

Further, Mr. Hanna testified that the Markarians received two checks for $5,000 and one for $2108.45 in connection with one of the above two claims; and one check for $5,000 and one for $1761.36 in connection with the other claim in an effort to avoid the requirement that an agent is forbidden from issuing a check for an amount greater than $5,000. (August 22, 1990 transcript, pp. 102–114).

The following alleged accidents occurred with respect to the vehicles owned by the Tirinkians: (1) one involving a 1986 Mercedes in approximately September of 1988 when Mr. Tirinkian had the car and the "glass was broken"; (2) one involving the Mercedes on April 9, 1989, when Mr. Tirinkian took the car to a movie theater; (3) one involving a green Rolls Royce on approximately January 13, 1988 when Mr. Tirinkian was in an accident; (4) one when Mr. Tirinkian had the green Rolls Royce shipped from Boston to Florida in November of 1988; (5) one when the green Rolls Royce was shipped from Florida to Boston in May of 1989; (6) one involving Mr. Tirinkian's white Silver Shadow Rolls Royce on June 4, 1988; and (7) one involving the white Rolls Royce when Vachig Petrosyans had the car on June 23, 1988.

Mrs. Tirinkian testified that she never saw any of the damage to the cars from any of the above alleged accidents.

With respect to the claim for the damage to the 1986 Mercedes in September of 1988, Mr. Tirinkian testified that the vehicle was damaged while parked. He could not, however, identify a specific individual by name who saw the damaged vehicle at the time

---

**10.** Mrs. Markarian testified that she had no personal knowledge of the accidents in question, but that her husband, Mr. Markarian informed her of the occurrences. (June 29, 1990 transcript, p. 25).

of the "accident". Instead, he testified that he was told to go home and file a police report the next day by a witness who he was unable to produce for testimony. In addition, he could not substantiate the occurrence of the accident by any other means. Steven Dexter prepared the appraisal for this claim, and Brian Louiseau completed a reinspection. (August 22, 1990 transcript, pp. 222–4).

Mr. Tirinkian testified, with respect to the accident involving the green Mercedes in April of 1989, that he was alone when the accident occurred. Brian Louiseau completed the appraisal for the green Mercedes in conjunction with that accident. (June 29, 1990 transcript, p. 211 and July 27, 1990 transcript, p. 171). When questioned, however, Mr. Tirinkian was unable to point to any receipts or invoices for parts or work in connection with the damage repair on the Mercedes after the April, 1989 accident. (June 29, 1990 transcript, p. 212). Further, Mr. Tirinkian could name only one other individual who had seen the damage to the Mercedes, and that person was not called to testify. In addition, Mr. Tirinkian did not have any pictures or other documentation of the damage. (June 29, 1990 transcript, p. 213).

With respect to the alleged accident involving the green Rolls Royce in January of 1988, Mr. Tirinkian testified that he was driving the car on Route 93 in New Hampshire when he lost control on the ice. (June 29, 1990 transcript, pp. 184–6). Mr. Tirinkian submitted an accident claim as a result of that occurrence through an insurance carrier other than Aetna. Subsequently, Mr. Tirinkian submitted a workman's compensation claim as a result of that alleged accident through Aetna. (June 29, 1990 transcript, p. 188). Mr. Tirinkian received

$8,500 from that claim. He did not, however, present an appraisal demonstrating the damages caused by the accident. In addition, there were no witnesses to the accident. (June 29, 1990 transcript, p. 190).

With respect to the claim for the damage to the green Rolls Royce allegedly occurring during transit from Boston to Florida in November of 1988, Mr. Tirinkian testified that the car was repaired under his supervision at the Hi–Tech Chassis Body Shop in Pompano Beach, Florida. (June 29, 1990 transcript, p. 222).[11] The testimony of Greg Nersissian, the manager of that body shop, also indicated that work was completed on the Rolls in his garage.[12] When further questioned, Mr. Tirinkian stated that the mechanical work was done at a different garage. (June 29, 1990 transcript, pp. 226–7). Neither Mr. Tirinkian nor Mr. Nersissian was able, however, to produce any repair records or additional completed work claim forms with respect to the work in question. (June 29, 1990 transcript, pp. 228 and July 27, 1990 transcript, p. 16).

Carole Chrzanowski, an employee of Forge Motors Auto Transport ("Forge Transport"), testified that the spoiler on the green Rolls Royce was cracked prior to the time the vehicle was transported. (July 27, 1990 transcript, pp. 68 and 74). Moreover, plaintiff's Exhibit # 5, which was marked for identification, acknowledging the damaged condition prior to transport, bears Mr. Tirinkian's signature.[13] (July 27, 1990 transcript, p. 74). Ms. Chrzanowski also testified that Forge Transport did not receive any notice of a claim from Mr. Tirinkian. (July 27, 1990 transcript, p. 78). The testimony of Robert Hanna indicates that it is Aetna's position that the damage occurred after the transportation of the

---

**11.** In addition, a completed work form stating that the work in question was completed at Hi–Tech bearing the signature of Lena Tirinkian was marked as plaintiff's exhibit # 7 for identification.

**12.** Mr. Nersissian stated that he knew Mr. Tirinkian through the Armenian church (July 27, 1990 transcript, p. 10). He also stated that Mr. Tirinkian paid for his flight to Boston to testify in this matter.

**13.** There was, however, some confusion with respect to the numerous carbon copies of the form in question which may indicate that the damage was noted on the original form kept in the possession of Forge Transport while not on the copy provided to the customer, in this case, Mr. Tirinkian. (*See* July 27, 1990 transcript, pp. 68–80).

vehicle and after transfer of the vehicle from the possession of Forge to Mr. Tirinkian, rather than before or during shipment. (August 22, 1990 transcript, pp. 38–9). Frank Rossell, an employee of Aetna, testified that he conducted an inspection of the green Rolls on December 12, 1988. (August 22, 1990 transcript, pp. 127–9). Mr. Rossell further testified that the damage he observed was not new, and that some rust appeared on the damaged areas. (August 22, 1990 transcript, p. 133). Mr. Tirinkian provided Mr. Rossell with a Forge Transport document which appeared to indicate some information with respect to the tail pipe, muffler, and spoiler of the vehicle. That information, in conjunction with what Mr. Tirnikian stated to the witness, indicated that the vehicle may have been damaged in transit. (August 22, 1990 transcript, pp. 130–5).

Mr. Rossell was also shown plaintiff's Exhibit # 5, a Forge Transport document, and he indicated that that document differed from the one he was shown by Mr. Tirinkian at the time of the inspection insofar as it did not include the handwritten remarks on the form provided by Mr. Tirinkian and that the document provided by Mr. Tirinkian was yellow or off-white in color. (August 22, 1990 transcript, pp. 130–2; see plaintiff's Exhibit ## 5; 8 (Forge documents from November, 1988 and May, 1989, marked for identification)). Mr. Rossell further testified that the mileage of the vehicle, as reflected on the transport document was 22,542 while the mileage on the appraisal is stated as 22,755. (August 22, 1990 transcript, p. 136). In addition, Mrs. Tirinkian submitted a rental receipt for a vehicle allegedly rented from Vahe's Auto Repair in Massachusetts from November 23, 1988 through December 28, 1988, yet Mr. Tirinkian testified that the Tirinkians were in Florida during at least a portion of that time period.[14] (August 22, 1990, pp. 174 and 198; see plaintiff's Exhibit # 23 (rental receipt from Vahe's Auto Repair, marked for identification)). Mr. Rossell testified, further, that the green Rolls Royce was driveable at the time he conducted the inspection referenced above.

Mr. Rossell could not identify anything which would indicate that a reinspection of the green Rolls was conducted in December of 1988 or January of 1989. (August 22, 1990 transcript, p. 139). In addition, Mr. Tirinkian could not point to anything other than a document labeled as an appraisal documenting the reinspection. (October 2, 1990 transcript, p. 252; see Plaintiff's Exhibit # 6 (appraisal dated December 12, 1988, marked for identification)).

Mr. Tirinkian testified that approximately thirteen thousand dollars was owed to him by Aetna, but never paid, for the damage caused to the green Rolls when it was subsequently shipped from Florida to Boston in 1989. (June 29, 1990 transcript, p. 163). Mr. Tirinkian, as in the situation when the car was originally shipped from Boston to Florida, signed a "Forge Motor Auto Transport Vehicle Delivery and Inspection Report" indicating that he received the car in good condition. (June 29, 1990 transcript, p. 232).

Ms. Chrzanowski testified that the car was received in damaged condition prior to the shipment of the vehicle from Florida to Boston. (July 27, 1990 transcript, p. 80). Mr. Hanna also testified that most of the damage found by the adjuster upon inspection after shipment of the Rolls Royce from Florida to Boston was the same as that observed by the adjuster in Florida.[15] (August 22, 1990 transcript, p. 60). In addition, Mr. Hanna testified that it is Aetna's position that the car was not damaged in transit; rather, that the damage had occurred at some point prior to shipment. (August 22, 1990 transcript p. 54). Mr. Hanna further testified that he did not believe a reinspection was completed in Florida after the alleged damage was repaired prior to returning the vehicle to

14. Aetna paid Mr. Tirinkian the amount of $450 as a result of that rental claim. (August 22, 1990 transcript, p. 177).

15. Mr. Hanna also testified that some of the damage, in particular the damage to the front spoiler, was the same as the damage that occurred in January of 1988. (August 22, 1990 transcript, p. 61).

Boston. (August 22, 1990 transcript, p. 55).

Lena Tirinkian again signed a completed work claim form, this time indicating that all of the repair work was completed at Watertown Foreign Car Center. (June 29, 1990 transcript, p. 234). Mr. Tirinkian, however, indicated that the body work was completed at Arsenal. (June 29, 1990 transcript, p. 235). Again, Mr. Tirinkian could not point to any records to substantiate expenditures in parts, etc. to complete the work. (June 29, 1990 transcript, p. 238). Brian Louiseau completed the appraisal and a reinspection with respect to that claim.[16] (July 27, 1990, p. 163). Brian Louiseau had previously prepared a stated value for that vehicle on August 24, 1988. (August 22, 1990 transcript, p. 215–6).

Mr. Tirinkian testified that, with respect to the white Rolls Royce accident in June of 1988, he was driving the vehicle when he was hit from behind. (June 29, 1990 transcript, pp. 135–37). There were, however, no witnesses to that accident, and the police did not go to the scene of the accident. (June 29, 1990 transcript, p. 192). Steven Dexter appraised the white Rolls twice after that accident.[17] Mr. Tirinkian testified that he repaired the vehicle at Arsenal. (June 29, 1990 transcript, pp. 139 and 193). A "completed work form" marked as plaintiff's exhibit # 4, however, stated that the work was done at Najarian's Grand Touring Cars, Limited (hereinafter "Najarian's"). (June 29, 1990 transcript, pp. 196–7; see plaintiff's Exhibit # 4). When confronted with this inconsistency, Mr. Tirinkian stated that the mechanical work was completed at Najarian's. (June 29, 1990 transcript, pp. 199–200). Mr. Najarian, the owner of Najarian's, testified that he did

repairs to the car's electrical system, and that the car was not physically damaged at the time he did those repairs. (July 27, 1990 transcript, p. 62). In addition, Mr. Tirinkian did not have any proof to substantiate payment for any work. (June 29, 1990 transcript, p. 200).

Vachig Petrosyans was allegedly the driver of the 1976 white Rolls Royce, Silver Shadow (belonging to Mr. Tirinkian) in an accident that occurred on June 23, 1989. That vehicle was the subject of one of the attachments at issue in the defendant's motion to vacate the *ex parte* attachments (Docket Entry # 217).[18] Mr. Petrosyans testified that he was involved in the accident with the white Rolls when he hit a blue Browning–Ferris Industries ("BFI") garbage truck at the intersection of Arsenal Street and School Street in Watertown. (June 29, 1990 transcript, p. 121; p. 127). Subsequent to that accident, John Johnson, Ray Ashton, and Brian Louiseau looked at the white Rolls.[19] (June 29, 1990 transcript, pp. 141–3). Mr. Tirinkian testified that Aetna then agreed, via Mr. Ashton, to pay Mr. Tirinkian $48,500 in return for the Rolls in settlement of that claim, but that he has not received the money.[20] (June 29, 1990 transcript, pp. 144–5). Mr. Ashton testified, to the contrary, that he did not handle negotiations with Mr. Tirinkian as to the payment of the claim. (July 27, 1990 transcript, p. 136). In addition, Mr. Ashton testified that he informed Mr. Tirinkian that he intended to refer the matter to the Special Investigative Unit at Aetna, because he was not satisfied with the circumstances surrounding the accident. (July 27, 1990 transcript, p. 136).

---

**16.** The reinspection in August, 1989, indicates that the damage observed by the original appraiser was repaired. (August 22, 1990 transcript, p. 65).

**17.** The appraisal completed by Steven Dexter in connection with this claim was marked for identification as Plaintiff's Exhibit # 3. That appraisal was for $12,024.28 (June 29, 1990 transcript, pp. 195–6).

**18.** *See supra* note 1 (issue of attachment on 1976 white Rolls Royce moot).

**19.** Mr. Ashton testified, however, that he inspected a "tan" Rolls, not a white Rolls. (July 27, 1990 transcript, pp. 131–2).

**20.** *See supra* note 1 with respect to the attachment on the white Rolls. Mr. Ashton testified that the $48,500 value was the stated value established by a different appraiser. He further explained that a stated value is determined by establishing what the vehicle is worth on the open market. (July 27, 1990 transcript, p. 135).

The testimony of Donald LeBlanc, an employee of BFI, indicates that no documentation with respect to such a collision exists. (June 29, 1990 transcript, pp. 264–5; October 2, 1990 transcript, p. 34). In addition, the testimony of Anthony Miller, a person engaged in the appraisal business, indicates that the "accident" did not occur by hitting the back of a truck as suggested by the Tirinkians in filing the insurance claim. (October 2, 1990 transcript, p. 83). The testimony of Robert DuBois, an accident reconstruction specialist, also indicates that the accident did not occur as described by Mr. Petrosyans. (January 16, 1991 transcript, pp. 106–9). Mr. Dubois testified, at length and with the assistance of several photographs and chalks, that the damage was actually the result of several different impacts and not a single event as claimed by the Tirinkians. (January 16, 1991 transcript, pp. 109–19; 125–34).[21]

In addition, Mohammad Haghighi testified to several instances where he, with the help of Peter Arhaggelidis, Sean Halloran, and P & B or Rodco, staged a fraudulent accident and submitted a claim to Aetna for the staged accident. (October 2, 1990 transcript, pp. 167–78). As a result of that action, Mr. Haghighi received checks from Aetna in the approximate amount of $5,600 and $800. (October 2, 1990 transcript, pp. 173 and 176).

 This court further notes the testimony of Mr. Timothy Cummings at the hearing on January 17, 1991. Mr. Cummings asserted his right not to answer counsel's questions under the fifth amendment when asked whether he had ever staged any fraudulent claims with Zareh Tirinkian, Lena Tirinkian, Arsenal Auto Repairs, Inc. d/b/a Arsenal Autobody, Tarja Markarian, Jack Markarian, or Haroutioun Markarian a/k/a Peter Markarian.[22] Mr. Cummings also asserted the fifth amendment when questioned about taking bribes or kickbacks from the aforementioned persons while he was an appraiser for Aetna. (January 17, 1991 transcript, pp. 100–01).[23]

In addition, this court notes, but does not find it necessary at this time to recount in detail, the existence of other claims filed by other defendants in which the Arsenal defendants are at least tangentially implicated.

The above elicited testimony is sufficient to demonstrate a reasonable likelihood of success on the merits in establishing a pattern of racketeering activity. The testimony indicates that the defendants fraudulently tried on multiple occasions to collect from Aetna on numerous vehicles. The claims were submitted over an extended period of time and involved the use of the United States mails. The testimony also indicates a commonality among the independent claims, thus meeting the requirement that the acts be "related." The testimony, accordingly, establishes at least a reasonable likelihood of success in demonstrating numerous schemes to defraud the plaintiff which results in a violation of RICO, notwithstanding that the insurance company was the victim in each instance. *See State Farm Mutual Automobile Insurance Co. v. Rosenfield,* 683 F.Supp. at 110 (four acts of mail fraud over two year

21. This court notes, after extensive review of the transcripts and exhibits in this matter, that it found Mr. Dubois to be a credible witness. In addition, this court notes that it need not, for the purposes of the instant motion, discuss the testimony of Mr. Dubois in any further detail.

22. It is a well recognized principal of law that a court may appropriately draw adverse inferences from the refusal of a person to testify in a civil proceeding. *See Baxter v. Palmigiano,* 425 U.S. 308, 318–19, 96 S.Ct. 1551, 1557–58, 47 L.Ed.2d 810 (1976) (permitting court to draw adverse inference from refusal to testify in civil proceeding). This court now draws those inferences, and concludes for purposes of the instant

motion, that Mr. Cummings did participate in staging such fraudulent schemes and in taking bribes and/or kickbacks from the Arsenal defendants.

23. After exhaustive review of the transcripts with respect to the present motion, this court notes that several other witnesses asserted their rights under the fifth amendment and declined to answer when questioned by counsel. This court does not, at this time, however, deem it necessary to rely on the testimony and inferences that may be drawn from the assertion of the rights under the fifth amendment with respect to those additional witnesses for the purposes of the motion in question.

period against three insurance companies sufficient to find pattern); *see Blue Cross and Blue Shield of Michigan v. Kamin,* 876 F.2d 543, 545 (6th Cir.1989) (dicta discussing violation of RICO where one victim and ten fraudulent insurance claims); *see also Fleet Credit Corp. v. Sion,* 893 F.2d 441, 445 (1st Cir.1990) (discussing "relatedness" and "continuity").

### (3) *Nexus*

■■■ The plaintiff must also demonstrate a nexus between the pattern of racketeering activity and the enterprise. The plaintiff demonstrated at least a reasonable likelihood of success in proving the existence of a sufficient nexus between the racketeering activity and the enterprise's affairs. "It is only when the predicate acts are unrelated to the enterprise or the actor's association with it that the nexus element is missing." *State Farm Mutual Automobile Insurance Co. v. Rosenfield,* 683 F.Supp. at 110. Such is not the situation in this case.

### (4) *Resulting Injury*

■■■ The plaintiff has sufficiently demonstrated a reasonable likelihood of success in establishing a resulting injury caused by the defendants' acts of racketeering. Although the specific amount of injury is not clear, the testimony does depict losses incurred by the plaintiff as a result of the predicate acts of racketeering. (*See* Affidavit of Robert Hanna, Docket Entry # 60; testimony of Robert Hanna; and testimony discussed *supra* ).

While clearly questions of law and fact exist concerning the allegations against the defendants, this court concludes, in light of the testimony and other evidence adduced at the hearings held in this matter, that Aetna demonstrated sufficient evidence to support the required finding of Aetna's reasonable likelihood of recovering judg-

ment in this action against the Arsenal defendants.[24]

## II. *Amount of Attachment*

Aetna asserts, in support of the instant motion, that the damages sustained as a result of the defendants' allegedly wrongful and deceptive practices exceed the amount of the attachments at issue. Aetna also states, in support of the attachments, that it is entitled to treble damages as well as attorneys fees in a civil RICO action.

The defendants contend, on the contrary, that the plaintiff has provided no factual or evidentiary support for the amount of damages caused by the defendants' actions.

■■■ As previously discussed, the party seeking an attachment must set forth with specificity the underlying facts in support of the attachment. This requirement includes proof of the reasonable likelihood of plaintiff's recovery of a judgment equal to or greater than the amount of the attachment. Mass.R.Civ.P. 4.1. The attachments at issue in the instant motion include the following: (1) attachment on trustee process of the bank account of Arsenal Auto Repair, Inc. at Coolidge Bank and Trust in the amount of $17,041.69; (2) attachment on trustee process of the bank account of Zareh Tirinkian and Lena Tirinkian at the Coolidge Bank and Trust in the amount of $3,097.52; (3) attachment on trustee process of the account of Tarja Markarian and Peter Markarian a/k/a Haroutioun Markarian at the Bank of New England in the amount of $1,208.10 (June 29, 1990 transcript, p. 19); (4) attachment on the real estate of Zareh Tirinkian and Lena Tirinkian located at 102 Longmeadow Road, Belmont, Massachusetts in the amount of $438,960.00;[25] (5) attachment on the real estate of Zareh Tirinkian held as trustee located at 50–52 Chauncy Street, Watertown, Massachusetts in the amount of $329,400;[26] and (6) attachment on real

---

**24.** In light of this finding with respect to the plaintiff's claim under 18 U.S.C. § 1962(c), this court need not, and therefore, will not address the likelihood of success on the merits of the other claims.

**25.** The property is encumbered by approximately $150,000 in mortgages and has an assessed value of approximately $403,300, resulting in approximate equity of $253,300.

**26.** The property is encumbered by approximately $150,000 to $200,000 in mortgages and has an

estate of Zareh Tirinkian held as trustee located at 59 Channing Street, Belmont, Massachusetts in the amount of $278,760.[27] Accordingly, the amount secured by trustee process is $21,347.31 and the amount of unencumbered attached real estate is approximately $379,800 to $389,800.

While this court does not find as specific proof of damages in this action as it would like, it does find the existence of evidence sufficient to demonstrate a likelihood of proving an amount of damages in excess of the amount of the attachments at issue.[28] This court finds the existence of such proof particularly apparent in light of the fact that the defendants would be liable for treble damages plus attorneys' fees and costs in the event that the plaintiff were to succeed on its claim for violation of RICO.[29]

### III. *Amount of Liability Insurance*

 A court must find, prior to approving an attachment, the plaintiff's reasonable likelihood of recovering judgment equal to or greater than the amount of the attachment sought over and above "any liability insurance shown by the defendant to be available to satisfy the judgment." Mass.R.Civ.P. 4.1(c).

No proof of the existence of any liability insurance has been demonstrated in this action. The defendant is responsible for showing the availability of liability insurance to satisfy the judgment or to offset the amount of the attachment. Mass. R.Civ.P. 4.1(c). Given that the defendants fail to present specific facts to warrant a finding to the contrary, this court concludes that the plaintiff has satisfied the insurance requirement insofar as the

amount of the attachment sought exceeds the liability insurance available, if any.

### CONCLUSION

The Motion to Dissolve *Ex Parte* Attachments of Defendants Arsenal Auto Repairs, Inc., Zareh Tirinkian, Lena Tirinkian, Jack Markarian, Peter Markarian, Tarja Markarian, and Haroutioun Markarian (Docket Entry # 217) is, therefore, DENIED in accordance with the above discussion. The motion is, however, MOOT insofar as it concerns the attachment of the 1976 Rolls Royce, VIN 24110 belonging to Zareh Tirinkian (Docket Entry # 54; *see* Docket Entry # 754).

---

assessed value of $232,000 resulting in an estimated equity of $32,000 to $42,000.

27. The property is encumbered by approximately $180,000 in mortgages and has an assessed value of approximately $274,500, resulting in an estimated equity of $94,500.

28. The complaint delineates approximately $72,285 in checks paid by the plaintiff to the Arsenal defendants for claims addressed at the hearings

held on the instant matter. When trebled, that results in approximately $216,855. In addition, the plaintiff has asserted the bases for additional damages as well as approximately $300,000 in attorneys' fees exclusive of investigative costs.

29. This court also notes the potential for greater liability on the part of the Arsenal defendants, because all of the defendants are jointly and severally liable in this type of action.